The ANACONDA COMPANY, a
Corporation of Montana

v.

METRIC TOOL & DIE COMPANY, a
Corporation of Pennsylvania.

Civ. A. No. 76–2434.

United States District Court,
E. D. Pennsylvania.

Feb. 12, 1980.

Charles E. McKenney, John J. Lauter, Pennie & Edmonds, New York City, for plaintiff.

John F. A. Earley, Harding, Earley & Follmer, Philadelphia, Pa., for defendant; Stockham & Donahue, Morrisville, Pa., of counsel.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a trade secret case. Plaintiff, The Anaconda Company ("Anaconda"), a Montana corporation, is best known for its mining operations. However, Anaconda is a diversified company also engaged in the fabrication of a varied line of products made from copper, aluminum, steel, and other materials, including a product known

as flexible metal hose.[1] One application of flexible metal hose is an item known as telephone cord armor ("TCA"), a strip-wound metal hose familiar to all users of coin telephones. TCA is what protects the telephone cord from wear and tear, abuse, and vandalism. Anaconda fabricates TCA on a sophisticated profile and winding ("P&W") machine which it engineered and built for this purpose, after a considerable and expensive development period.

Anaconda claims that the design of its P&W machine used to make TCA is a trade secret which was misappropriated by the defendant Metric Tool & Die Company ("Metric"). Metric is a Morrisville, Pennsylvania concern [2] which was originally engaged in small scale manufacturing operations, including stamping and drilling and the design and manufacture of sundry machine tools and dies. Metric began to manufacture TCA after it was invited to bid on TCA by Western Electric Company, Inc., ("Western Electric" or "Western"). Western is the principal buyer of TCA in the nation, and Metric has now succeeded Anaconda as Western Electric's principal supplier of TCA. Anaconda claims that the misappropriation was achieved by industrial piracy: the hiring of Anaconda employees from its Mattoon, Illinois, plant and the unauthorized removal from that plant of certain tooling and drawings which served as a material aid to Metric in the construction of its own P&W machine for the manufacture of TCA.

Metric's principal defense is that it designed, engineered, and built its P&W machine on its own, admittedly with some help from some former Anaconda employees, but essentially on the basis of the expertise of Metric's president and sole stockholder, Edward Hussian ("Hussian"), an experienced tool and die maker. *Inter alia*, Hussian claims that Metric built the machine through "reverse engineering"—*i. e.* working backward from the finished product, TCA, which Western had made available to him. Metric has also interposed a number of other defenses: that Anaconda's P&W machine design did not constitute a trade secret because it was not sufficiently novel, because many of its component parts were publicly available, and because Anaconda had not protected the confidentiality of the machine's design; that the alleged misappropriation occurred more than six years before the initiation of this lawsuit, which consequently is barred by the statute of limitations; and that Anaconda was guilty of laches because of its delay in bringing this suit.

Jury trial was waived by the parties. The trial of the case consumed eight days. For reasons which follow, we find that Metric misappropriated Anaconda's trade secrets in the design of its P&W machine, and enjoin Metric's use of those trade secrets for a period of 16 months, but decline to award damages because of laches.

This opinion constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## II. *Findings of Fact*

### A. *The Anaconda Profile and Winding (P&W) Machine*

P&W machines are used for the production of a variety of strip-wound flexible metal hose products, ranging from oil cans, shower hoses, and small diameter cable to TCA. The machines have been designed by many companies and have been used and patented for sixty years or more. At present, there are approximately 30 companies in the United States which manufacture some type of flexible metal hose.

P&W machines consist of 3 units: forming, winding, and hose take-up.[3] In the forming unit, a metal strip of rectangular cross section is subjected to a number of

---

1. Anaconda entered this business through its acquisition many years ago of American Brass Company, which started manufacturing flexible metal hose in the early 1900's.

2. Metric is a Pennsylvania corporation. Jurisdiction is predicated upon diversity of citizenship, 28 U.S.C. § 1332(a).

3. The take-up unit is optional; some machines include only forming and winding units.

rolling operations, each of which involves passing the strip through sets of specially designed rolls. These forming rolls are positioned and dimensioned so that the strip is shaped into a specific profile. The formed strip is next fed to the winding unit wherein winding heads or equivalent winding means are positioned to form the strip into a helically interlocked hose. Finally, the formed hose is led from the winding head using a guide or take-up unit. No P&W machines have been offered for sale to the metal hose industry by equipment manufacturers. Thus, companies in the industry have been required to design and build their own machines for internal use.

Starting in about 1953 Anaconda (acting through its Metal Hose Division) entered on a project to engineer and design an all-purpose full line P&W strip wound metal hose machine for use by the Division in producing a variety of metal hose products. A prototype of the P&W machine was built in 1954 and the final design for a P&W machine was settled on in about 1955. In all, over twenty man-years were devoted to the project. Anaconda's P&W machine was and is capable of producing a wide variety of strip wound metal hose from about ⅛ inch in diameter through 4 inches in diameter. By changing tooling, substituting parts and making machine adjustments, the Anaconda P&W machine could be set up to make shower hose, oil can hose, small diameter cable, telephone cord armor or a host of other metal hoses. A number of these P&W machines were built by the Metal Hose Division in the 1950's. Some were set up and operated at Waterbury, Connecticut, and others were shipped to the Division's manufacturing facility in Mattoon, Illinois. Later several machines were sent to the Division's plant in Amsterdam, Holland. A set of blueprints of the drawings have since the 1950's been held in Mattoon for servicing and maintenance purposes.

The P&W machine has many parts due to its adjustability and versatility as well as its complicated function. Over two hundred (200) drawings are required to manufacture the machine. Seventy to one hundred separate sets of tooling are held in inventory by the Division for making a variety of metal hoses as required and demanded by the Division's customers. As we have noted, Anaconda designed and built its P&W machines for its internal use in manufacturing products for sale. Competitors have been required to do likewise since no P&W machines have been offered for sale to the metal hose industry by equipment manufacturers.

The Anaconda P&W machine was specially tooled in the early 1960's to make TCA. Until Metric began manufacturing TCA, no other American manufacturer had a P&W machine capable of such production. Anaconda has manufactured TCA only in its Mattoon, Illinois, plant. Since the early 1960's, Anaconda has sold TCA to a number of customers, though its principal customer was Western Electric. Because Anaconda was its sole supplier, Western Electric attempted throughout the 1960's to develop a second supplier by forwarding product specifications and drawings to other companies, inviting them to submit samples. However, until Metric entered the business of TCA manufacture, Western was unable to find a second supplier.

While the question whether plaintiff possesses a trade secret is ultimately a question of law, there must be a factual predicate for resolving that question. We conclude, see discussion infra, that plaintiff possesses a trade secret in its P&W machine which makes TCA. As the essential factual predicate, we find that the specific items listed below in Appendix A,* which are used in combination as part of a P&W machine for the manufacture of telephone cord armor, are the trade secrets of the plaintiff. Each of the items accomplishes a useful function, directly or indirectly, in forming, guiding, and winding a metal strip to produce a finished hose.

### B. The Proprietary Nature of Anaconda's P&W Machines

All of Anaconda's P&W machines have been held in secrecy in the Metal Hose

---

* Withheld from publication by court order.

Division's three plants in Waterbury, Connecticut; Mattoon, Illinois; and Amsterdam, Holland. Anthony J. Porzio, manager of manufacturing and engineering of Anaconda ("Porzio") testified that none of the machines have been publicly exhibited, described in any publication, or sold. He also stated that none of the machines have been patented, thus precluding public inspection of the patent records. As we have noted, until Metric began manufacturing TCA hose no other American manufacturer had a machine capable of such production.

Since Anaconda began to produce hose on its P&W machines, it has maintained plant security against plant visitors in all of its metal hose production facilities. Porzio identified a document which he had written and placed in the standard practice instructions manual of Anaconda, relating to plant visits and the restrictions on visitors in Anaconda's plants. The instruction, which was promulgated in 1973 for the Waterbury plant, prohibited even escorted visitors from being brought to machines which were deemed proprietary in nature, including the P&W machines. Thus, to view the machines, visitors were relegated to "main aisle" tours providing only a distant view. Although plaintiff has not produced a similar document applicable to the Mattoon plant prior to 1973, no evidence presented showed company policy to be otherwise. Porzio testified that the same company policy had existed since 1952 with respect to Mattoon. We credit that testimony.

Although Anaconda's employees were never specifically instructed *in ipsis verbis* as to the proprietary nature of the P&W machine, we find from the evidence that the employees had such knowledge. First, Porzio testified that employees of the maintenance crew of the tool and grinding group, the machine shop, and the department in which the machines operate were aware of the policy concerning visitors to the plant. Second, the maintenance people erected screens and barriers around the machines when tours were to be conducted, with the greatest screening surrounding those machines closest to the tour aisle. Finally, Charles Van Meter, a former Anaconda employee who assisted Metric in building its P&W machine, testified that he and others believed or were told that the Anaconda machines were "patented." We reject defendant's contention that this is evidence of a lack of secrecy in guarding the machines because patents are open to public inspection. To a layman, the belief that something is patented conveys an image that the item in question is the exclusive property and right of the patentee. We find that Van Meter's testimony is further evidence of the proprietary nature of the Anaconda P&W machine.

C. *Metric's Construction of Its P&W Machine*

The genesis of Metric's entry into the business of TCA manufacture was a 1966 visit by Hussian to Western's purchasing offices in Baltimore, Maryland, on other business. Hearing about Western's desire to secure a second source of TCA, Hussian conferred with Western engineers and received samples of and specifications for the finished product. He also learned at that time that Anaconda was then Western's sole supplier of TCA, and that Anaconda's production facility for TCA was at Mattoon, Illinois. Hussian thereupon decided that Metric would enter the TCA market.

Hussian's first approach was to attempt to buy a P&W machine from Tubest, a large French company located in Paris. Tubest had extensive experience in the manufacture of various forms of metal hose,[4] and manufactured TCA for use in France. It offered to manufacture TCA to meet Western's specifications, which Hussian could sell to Western as a middleman, but was unwilling to sell him a P&W machine. When Hussian's approach to Tubest proved unsuccessful, he decided that Metric would produce the hose on its own. Hus-

---

4. Hussian was born in Marseilles, France, and studied tool and die making there, and thus knew of Tubest's operation.

sian began by experimenting with hand-made rollers and developed a hand-cranked machine for shaping stainless steel strip into a configuration for winding. While he made some modest progress, his project was miles from fruition and he had no machine capable of producing TCA.

Hussian thereupon placed advertisements in the Philadelphia and Mattoon newspapers for tool and die makers. Although there were responses to the local Philadelphia advertisement,[5] Hussian did not seriously consider any of them, for he was looking for men with specific experience in the manufacture of TCA on the Anaconda machine. He traveled to Mattoon, and paid an unauthorized visit to the Anaconda plant, under circumstances described below. Through certain leads, he found Wilson Ames, an unemployed tool and die maker who had worked for some time at Anaconda's Mattoon plant on repairing and rebuilding P&W machines which manufactured TCA. Hussian hired Ames in April, 1968, and shortly thereafter Ames moved to Pennsylvania and commenced employment at Metric.

When Ames arrived at Metric's plant, Metric had no machine for producing metal hose even though it had sought to develop one for over two years. The only apparatus it had was a hand-cranked forming unit which Hussian and his former partner, Raymond Arzounian, had "jerry-rigged."[6] Ames brought with him drawings which he had taken from Anaconda and pieces of discarded winding rolls. Hussian knew that Ames kept these purloined items in his toolbox at Metric. Using the drawings and discarded tooling, along with knowledge which he gained while rebuilding, repairing, and servicing Anaconda's hose machines at Mattoon, Ames worked full time to "design" and construct a P&W machine and the necessary tooling for producing TCA. At one point during his employment at Metric, Ames returned to Mattoon for a brief visit, traveling with another Metric employee, Phillip Sauers, Jr. On the day after his return to Pennsylvania, Ames showed Sauers a new set of winding rolls. Sauers subsequently saw the winding rolls in Metric's machine.[7]

Sauers and other Metric employees were engaged in machining parts for the P&W machine. They used drawings from which Hussian had cut out the "title block" which normally would have contained the name of the company which was proprietor of the drawings. Moreover, the drawings were cut into pieces so that no Metric employee, other than Ames, ever saw a drawing for more than a small part of the machine. Hussian instructed employees who worked on the construction of the machine not to discuss the project with other Metric employees who were not involved. The machine was assembled in a separate enclosure in a corner of Metric's plant, and only Ames

---

5. Morrisville, Pennsylvania, where Metric is located, is near Philadelphia. We take judicial notice of the fact that there are a great many tool and die makers who live and are available for employment in the Philadelphia area. Moreover, if Hussian were seeking men with experience in manufacturing flexible metal hose, but not specifically in manufacturing TCA on Anaconda's P&W machines, he might have looked for employees or former employees of Pennsylvania Flexible Metallic Tubing Company in Paoli, Pennsylvania; Atlantic Metal Hose Company in New York, New York; Allied Metal Hose Company in Long Island City, New York; or Anaconda's other plant in Waterbury, Connecticut, among others. All these locations, which are mentioned in the record, are much closer to Philadelphia than Mattoon, Illinois.

6. Ironically, after Metric had developed a P&W machine capable of making TCA, Arzounian left the firm, took the know how, and formed his own firm for the manufacture of TCA. He has since secured a goodly portion of Western Electric's business. Now Western's sole suppliers are Metric and Arzounian's firm, Metal Flex Hosing Company.

7. Sauers also testified to certain statements which Ames made at that time. While those statements were plainly hearsay, we ruled at trial that they were admissible to show Ames' intentions. See F.R.Evid. 803(3). However, Ames' intentions are not relevant to our present findings, and we do not rely on Sauers' testimony in that regard. We note also that there is no evidence that Hussian was aware that Ames brought back winding rolls after his trip to Mattoon.

and Hussian were permitted in the enclosure. The makeshift walls surrounding the machine were later replaced by permanent walls, making the temporary enclosure a permanently separate room. Discarded parts from the development of Metric's machine were crushed and destroyed.

When Ames suddenly left Metric in late 1968, the P&W machine was complete except for the drive section, the lubricating system, and the system holding the material as it went into the forming rolls. However, all that the machine could produce was a crude product which did not meet Western Electric's specifications. While Western accepted some non-conforming product with a view to inducing Metric to continue its efforts to become a bona fide second supplier, Hussian knew that much more had to be done to perfect the machine. Bypassing any attempt to locate assistance in the Philadelphia area, Hussian flew to Mattoon. Within forty-eight hours, he had hired Charles Van Meter, another former Anaconda employee who had been recommended by Ames. Like Ames, Van Meter had gained experience in servicing, repairing, and rebuilding Anaconda's P&W machines during his employment in the Mattoon plant. Hussian hired Van Meter at a wage that was substantially higher than both Van Meter's wage at Anaconda and Metric's pay scale for employees with comparable experience.

Van Meter's assignment during an eighteen-month stint at Metric, from November 1968 to June 1970, was to get Metric's P&W machine to produce metal hose in commercial quantities. Initially he worked only part-time because the machine required periodic reconstruction and repair. *Inter alia,* he identified a problem arising from the inferior grade of steel which Metric had been feeding into the machine. By the fall of 1969, the machine was producing quantities of TCA, but it was not until late 1970 that Metric could produce the hose without substantial rejection by Western Electric. Metric subsequently built four more P&W machines during the early and middle 1970's, for a total of five.

D. *The Similarity of Anaconda's and Metric's P&W Machines: Misappropriation or Reverse Engineering?*

Metric's P&W machines and its TCA tooling are amazingly similar to the Anaconda P&W machines and Anaconda's tooling. Anaconda's experts Porzio and Donald Kumpikevich, Anaconda's supervisor of manufacturing engineering ("Kumpikevich"), carefully compared the respective P&W machines and tooling. The comparison was based on photographs, measurements, and inspections of Metric's machines made during pretrial discovery. Their survey revealed that the machine parts, their arrangement, function, operation and purpose are identical, and that the contour, shape, profile and configuration of the tooling are the same. In most instances the dimensions of the tooling are the same within a few thousandths of an inch, which differences are explained by wear and by the difficulty in measuring such small dimensions. In particular, Porzio and Kumpikevich used hand-held instruments to measure winding and profile rolls taken from Metric machines. These measurements showed that the Metric rolls had the same shape configuration and were dimensioned the same as corresponding parts in Anaconda drawings, after taking into consideration the wear of the Metric rolls and the degree of accuracy one could expect from measurements made under the circumstances of the plant inspection.[8]

Metric's P&W machines parallel Anaconda's in details such as belts, bearings, notch shapes, and holder cap plates even though there is no standardization for this type of equipment in the metal hose industry. The Metric P&W machine followed Anaconda's machine even to the extent of duplicating a design error in the construction of the outboard bearing support plate for the winding roll shaft, and duplicating Anaconda's method of correcting the error by installing

---

8. Metric's comparator, an instrument which would have permitted more accurate measurements during the plant inspection, was not operating during the day of the inspection.

a holder cap plate. Metric also built into its machines means for adjusting and tilting the winding head and its winding holders. While these features were present on Anaconda's machines, they were not needed for telephone cord armor manufacture. This similarity to the Anaconda machines is unnecessary and useless, since the basic purpose of Metric's machines was to manufacture TCA hose, and is further evidence that Metric copied Anaconda's design.

Anaconda claims that this similarity can only be a result of Metric's unlawful misappropriation of Anaconda's proprietary information. Porzio, the Metal Hose Division's chief engineer, who has had experience in comparing similarities in commercially available equipment, commented that "The number of similarities and identical numbers . . . I have never in my experience found to exist between other equipment."

Metric correctly states that various components of Anaconda's P&W machine have analogs or counterparts in the prior art, as evidenced by patents.[9] However, though the patents introduced here show a number of P&W machines, none of the machines or tooling shown in the patents are capable of making TCA to meet Western Electric's specifications without significant modification or redesign requiring much expertise and hard work. None of the patent holders have ever produced TCA hose. Thus, although many of the components of Anaconda's P&W machine are derived from basic mechanical engineering principles that are well known in the industry, we find that the particular permutations, combinations, and applications in Anaconda's P&W machine are unique and not a matter of public knowledge.

We also reject Metric's contention that its P&W machines were independently designed by reverse engineering or other processes. Reverse engineering is a process by which one analyzes a finished product and, working backwards, designs the machine capable of producing such a product. L. David Leiter, a registered professional engineer, testified on behalf of defendant that an experienced mechanical engineer or machine tool designer of ordinary skill, given samples of TCA and given the Western Electric specifications, would be able to reverse-engineer a machine to make the product. While we accept Leiter's contention that Metric *could* eventually have built a P&W machine (though not the one it actually built) by reverse engineering, given enough skill, time, and effort, we are convinced that Metric did not do so.

Anaconda's witnesses Porzio and Kumpikevich testified that one could not, from a study of the final piece of TCA and of the Western Electric specifications, have created the same sophisticated tooling with its numerous gradations and tolerances, which they put together after two solid years of design engineering to create Anaconda's machine. We are persuaded by Porzio and Kumpikevich's testimony that the sophistication and detail of Anaconda's machine is too great to be duplicated to such a remarkable degree of similarity by reverse engineering. Moreover, while Hussian is a competent tool and die maker, there is nothing in the record which suggests that he possessed any unusual sophistication or ability such as would be necessary to perform the remarkable feat of reverse engineering necessary to duplicate Anaconda's machine from a piece of TCA plus Western Electric's specifications. There is not even evidence that Hussian was familiar with the general state of the art as reflected by the patents on P&W machines or that he did any research in connection with the matter.

We find that the Metric machine was created not by reverse engineering, but by application of the knowledge of the Anaconda machine which Ames and Van Meter acquired while working on the Anaconda machine, by use of drawings which Ames had taken from Anaconda, and by direct incorporation of Anaconda winding rolls procured by Ames.

---

9. These components include a forming station, powered arbor, winding station, guides for the metal, rotating accumulating drum, rotational adjustment of winding roller holders, change gears, and others.

As we have noted, a competent tool and die maker like Hussian *could* have designed and built a machine for TCA manufacture by means of reverse engineering, given enough time and effort, even though he did not in fact do so. Metric's witness Leiter testified that this feat of reverse engineering could be accomplished in approximately one year, with an expenditure of $100,000. Anaconda's witnesses testified that it took them approximately two years to design and build Anaconda's machine. However, Metric's task would have been made somewhat easier by the availability of the finished product, TCA. We estimate the time necessary for independent development of a machine capable of manufacturing TCA, by means of reverse-engineering from the finished product, at sixteen months.

### E. *Anaconda's Delay in Initiating Legal Action*

As the foregoing findings indicate, the misappropriation of Anaconda's proprietary information was completed by June, 1970, when Van Meter left Metric. The complaint in this action was filed on August 3, 1976. For reasons which will appear in due course, we hold that the action is not barred by the statute of limitations. However, since Metric contends that the action is barred nonetheless by the equitable doctrine of laches, we must make findings of fact concerning Anaconda's delay in bringing suit.

On Saturday, March 9, 1968, Howard Cisna, an Anaconda employee, encountered Edward Hussian in Anaconda's Mattoon plant in the vicinity of the winding machines. Cisna was unaware of Hussian's identity at the time, but he had responded to Hussian's advertisement in the Mattoon newspaper, and later on March 9, 1968, Cisna had an interview with Hussian at a local motor inn. Hussian offered to hire Cisna to help Metric design a P&W machine, either on a full-time basis, or for five consecutive weekends at $1000 per weekend plus expenses. Cisna reported these events to Eugene W. Hogan, the manager of the Mattoon plant, who reported them to his superior C. E. Webbe,

who was at the time vice-president in charge of Anaconda's Metal Hose Division, stationed in Waterbury, Connecticut. Webbe in turn reported the events to Messrs. Donovan and Hammond, other executives at Anaconda, in a memorandum dated March 13, 1968. In that memorandum, Webbe stated expressly that Cisna "was offered a job by Hussian *to design and build winding machines* for him." (emphasis added) Webbe commented, "We can't stop people from going into the metal hose business, but the way this gentleman went about it is most unethical."

In a subsequent letter to Webbe dated April 4, 1968, Hogan recounted in detail the events of March 9, including both Hussian's unauthorized visit to the Anaconda plant and his offer to hire Cisna to design and build a winding machine. Hogan added a report of subsequent events. He stated that on March 26, 1968, a man fitting Hussian's description had approached Fred Wilson, an Anaconda toolsetter on the winding machines, with questions about the construction of "Western Electric Hose." Hogan commented, "we have to assume that whoever contacted Fred will be contacting other toolsetters for the same information."

On April 15, 1969, Hogan wrote Webbe another letter concerning Metric. Hogan reported that H.L. (Hobie) Clark, an Anaconda employee, had been offered a job "by someone whom we suspect was Mr. Edward Hussian, President of Metric" at twice Clark's salary with Anaconda. Subsequently, Clark met Charles Van Meter, who was then working for Metric. As Hogan reported:

> Charlie told Hobie he was now working for Metric as a toolsetter/operator on a new winding machine built by Wilson Ames. Charlie is . . . manufacturing a size of stainless steel flexible metal hose comparable to our PS 2086. Charlie indicated Metric was selling this hose to Western Electric. . . .
>
> . . . The main difficulty in getting the job started, before Charlie came on the scene, was in the center leg section of the first profile roll. As soon as Charlie

straightened this out he apparently got the machine running rather quickly. . .

In any event, we have to assume Metric is probably trying to attract other employees of ours to either leave us or provide them with information, verbally or in the form of prints or drawings. We are doing everything possible to tighten our security in winding tools and drawings so that it would be extremely difficult for anyone to remove them from the premises.

Hogan admitted in his testimony that in 1968 or 1969, he did suspect that Hussian had acquired "[i]nformation from our former employees . . . [a]bout the winding machines, the profiles of the hose, the hoses themselves, how they are manufactured, the tooling."

Thus, by April 15, 1969, Anaconda executives knew that Hussian had paid an unauthorized visit to the Mattoon plant; that Hussian had advertised in the Mattoon newspaper for tool and die makers; that he sought to hire present or former Anaconda employees at high salaries to design and build a P&W machine for the manufacture of metal hose; that he had in fact hired Ames and Van Meter, who had built a P&W machine; and that Metric had begun manufacturing TCA for sale to Western. Hogan, at least, actually suspected that Metric had received proprietary information about Anaconda's P&W machine, the tooling of the machine, and the process of TCA manufacture. Nevertheless, Anaconda took no steps to determine whether or not Metric had misappropriated its trade secrets, or to assert its legal rights.

In December, 1969, J.J. Moran, an Anaconda salesman, learned during a visit to Western Electric's premises in Baltimore, Maryland, that Metric had been approved as a source for TCA, and that an order for 50,000 pieces had been placed with Metric at a price 7% lower than Anaconda's price. He communicated this information to Webbe in a memorandum dated December 12, 1969, along with samples of Metric's product which he had acquired during his visit to Western. He noted that "the assembly looks poor compared to ours," and that the dimensions were slightly outside the range of Western's specifications. In April, 1970, Moran reported to Webbe that "the buyer indicated they [Metric] were not a useable source." However, during the same month, Moran acquired another sample of Metric production which he transmitted to Webbe, commenting in his memorandum of May 1, 1970, that it looked "a hell of a lot better than the last stuff we saw." Anaconda technician M.M. Symanovich tested both samples, and reported to Webbe on May 8, 1970, that his tests of the April 1970 sample showed that, "Generally speaking, the hose assembly is much better" than the December, 1969, sample. Thus by May, 1970, Anaconda executives knew that Metric had become an approved source for TCA; that it had subsequently been removed as an approved source, presumably for failing to meet Western's specifications; but that it had soon thereafter submitted a greatly improved product to Western. Anaconda had notice at least that serious competition from Metric was imminent. Yet Anaconda still took no steps either to determine whether or not Metric had misappropriated its trade secrets, or to assert its legal rights.

One action which Anaconda did take was to make it impossible for Metric to move its business into Mattoon. Hussian had made inquiries of the Mattoon Association of Commerce concerning available industrial buildings, and had received a letter from George M. Pendell, the manager of the Association, concerning the Columbia Machine Building. But Hogan stated in his April 4, 1968, letter to Webbe that:

I have contacted George Pendell and he assures me Metric Tool & Die, Inc. will not find a building in Mattoon to use for manufacturing metal hose or anything else if he can help it. George has passed the word along to Columbia Machine that for several reasons they would prefer not to have this outfit in Mattoon.

Webbe himself had reported previously in his memo of March 13, 1968, that:

Gene [Hogan] has talked to George Pendell and Pendell will make sure that the Columbia Machine building is not available to this outfit and presumably that no other building is available.

Anaconda's efforts to prevent Metric from opening a plant in Mattoon were superfluous, because Hussian had already rejected the idea. He testified, "The town didn't have any cultural significance. It did not attract me, so I decided not to do anything with Mattoon."

After Metric began producing TCA in commercial quantities, it quickly supplanted Anaconda as Western's principal supplier. Western placed no orders for TCA during 1970 and again during 1974. In 1971, 1972, and 1973, Metric supplied well over 50% of Western's requirements. In 1975 and 1976, Western purchased no TCA whatsoever from Anaconda, satisfying its requirements instead with purchases from Metric and Metal Flex Hosing Company.[10] Despite the serious inroads which Metric was making on its TCA business, Anaconda still made no efforts to ascertain whether or not Metric had illegally misappropriated its trade secrets, or to assert its legal rights.

In May, 1976, Phillip Sauers, Jr., by then a disgruntled former employee of Metric, contacted Anaconda's legal counsel in New York. Sauers turned over detailed photographs which he had taken of Metric's P&W machine and gave Anaconda a statement concerning the construction of Metric's machine. Shortly thereafter, Anaconda filed this action.

## III. *Discussion*

### A. *Does Anaconda's P&W Machine for the Manufacture of TCA Constitute a Trade Secret?*

The threshold question which we must decide is whether plaintiff possesses a legally protectible trade secret in its P&W machine for the manufacture of TCA. Metric contends that the design of the machine is not a trade secret because it incorporates parts and principles which are matters of public knowledge, and because Anaconda failed to take adequate precautions to protect the secrecy of the design.

■ Although the issue is easily framed, the resolution is more difficult, for the law provides no precise definition or litmus test of what constitutes a trade secret. The most comprehensive definition is set out in Comment b to the Restatement of Torts § 757 (1939), which has been adopted in Pennsylvania as well as many other jurisdictions.[11] *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200 (1976); *Sperry Rand Corp. v. Pentronix, Inc.*, 311 F.Supp. 910 (E.D.Pa. 1970) (Davis, J.). *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 474–76, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974). Comment b states, in pertinent part:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers . . . Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. . . .

. . . The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. . . . Nevertheless, a substantial element of secrecy must exist, so that, except by the

---

**10.** *See* n. 6, *supra*.

**11.** The parties agree that Pennsylvania law governs.

**422**

use of improper means, there would be difficulty in acquiring the information. Restatement of Torts § 757, Comment b at 5–6 (1939). "The secrecy in which a purported trade secret is shrouded need not be absolute but reasonable precautions under the circumstances must be taken to prevent disclosure to unauthorized parties. The degree of secrecy must be such that it would be difficult for others to obtain the information without using improper means." *Greenberg v. Croydon Plastics Co.*, 378 F.Supp. 806 (E.D.Pa.1974) (Lord, C. J.).

Prior to defendant's entry into TCA manufacture, the only producer of such hose in the United States was Anaconda. As we have found, no other manufacturer had a P&W machine capable of producing TCA to meet Western's specifications. We give this considerable weight in finding that the Anaconda machine was not a matter of public knowledge. Defendant offered evidence that other manufacturers produced strip-wound metal hose on P&W machines, that many of the components of Anaconda's machine were common to the industry, and that certain features of plaintiff's machine were similar to those of other machines which had been patented and therefore were open to public inspection. However, defendant misunderstands or misstates the degree of novelty required to establish a trade secret.

Novelty is only required of a trade secret to the extent necessary to show that the alleged secret is not a matter of public knowledge. *Kewanee Oil, supra,* 416 U.S. at 476, 94 S.Ct. at 1883; *Sims v. Mack Truck Corp.,* 488 F.Supp. 592 at 598–599 (E.D.Pa.1980) (Lord, C. J.). A trade secret may be no more than a slight mechanical advance over common knowledge and practice in the art. *Greenberg, supra,* 378 F.Supp. at 812; Restatement of Torts § 757 Comment b at 6–7. As the Second Circuit noted in *Imperial Chemical Industries, Ltd. v. National Distillers and Chemical Corp.,* 342 F.2d 737, 742 (2d Cir. 1965), "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but

the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *See also Sun Dial Corp. v. Rideout,* 16 N.J. 252, 108 A.2d 442 (1954). Here it was the precise configuration, juxtaposition, and assemblage of components and features set forth in Appendix A, rather than the breaking of heretofore unknown ground, which made plaintiff's P&W machine unique. Since this degree of novelty is legally sufficient to constitute a trade secret, we reject defendant's contentions.

We are also convinced that the precautions which plaintiff took to maintain the confidentiality of its P&W machine were sufficient to afford the machine trade secret status. As we have found, plaintiff had an established policy of plant security which afforded visitors only highly restricted access to the machine. Moreover, plaintiff never advertised or publicized its machine in any manner. While Anaconda's employees who were responsible for operating, repairing and rebuilding the P&W machine were quite familiar with its construction and operation, they were aware of its confidential nature, and the disclosure to them of Anaconda's proprietary information was necessary to the performance of their duties. Although the secrecy maintained was by no means absolute, it was such that except by the use of improper means, defendant would have had difficulty in acquiring the information. We conclude that Anaconda had a protectible trade secret in its P&W machine for the manufacture of TCA.

**B.** *Is Metric Liable for Misappropriation and Wrongful Use of Anaconda's Trade Secret?*

Liability for unauthorized use of another's trade secret is defined in Restatement of Torts § 757 which, as we have already noted, has been adopted as law in Pennsylvania. The Restatement provides:

One who . . . uses another's trade secret, without a privilege to do so, is liable to the other if

(a) he discovered the secret by improper means, or . . .

(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other.

. . .

In its comments to § 757, the American Law Institute observes that these two grounds of liability are not mutually exclusive:

> The rule stated in Clause (a) of this Section applies to improper means in procuring the secret not only from the owner but also from any third person holding the secret under a duty to the owner not to disclose it to others. . . . [I]f the actor intentionally procures the third person to make a disclosure in breach of his duty, the actor may be liable under both rules [(a) and (c)]; under the former because inducing one to commit a breach of duty is an improper means of procuring the secret; and under the latter because of the actor's knowledge of the breach.

Restatement of Torts § 757, Comment h at 12 (1939). We have already found that Metric learned of the construction of Anaconda's P&W machine from Ames and Van Meter, whom Metric hired for that purpose. We must now determine (a) whether Metric had notice that Anaconda's P&W machine was a secret; (b) whether Ames's and Van Meter's disclosure of the secret breached their duty to Anaconda; (c) whether Metric had notice that Ames's and Van Meter's disclosure of the secret was a breach of their duty to Anaconda; and (d) whether Metric intentionally procured Ames and Van Meter to make disclosures in breach of their duty, thus acquiring the secret by improper means. We consider these issues in the order stated.

1. *Did Metric Have Notice That Anaconda's Machine Was a Secret?*

The Restatement defines "notice" as follows:

> One has notice of facts under the rule stated in this Section when he knows of them or when he should know of them. . . . He should know of them if,

from the information which he has, a reasonable man would infer the facts in question, or if, under the circumstances, a reasonable man would be put on inquiry and an inquiry pursued with reasonable diligence would disclose the facts.

*Id.* Comment 1 at 14–15. We have no doubt that Hussian knew or should have known that Anaconda's P&W machine was a secret. Hussian knew that Anaconda was Western's sole supplier of TCA, and that no other American manufacturer had a machine capable of making TCA to Western's specifications. He knew that no P&W machine was available on the open market, and had in fact been rebuffed in his efforts to buy a P&W machine from Tubest. Moreover, Hussian surrounded Metric's own P&W machine with a veil of secrecy, building a separate enclosure for it and instructing employees not to discuss their work on the machine. *See* p. 416, *supra.* We find that Hussian had at least enough information to put him on inquiry as to the secret proprietary nature of Anaconda's P&W machine.

2. *Did Ames's and Van Meter's Disclosure of the Construction of Anaconda's Machine Breach Their Duty to Anaconda?*

Although Ames and Van Meter had made no express agreement with Anaconda not to disclose its secrets in the P&W machine, nevertheless their disclosure was wrongful if the nature of their relationship with Anaconda gave rise to an implied duty of nondisclosure. An employee, upon terminating his employment relationship with his employer, is entitled to take with him "the experience, knowledge, memory, and skill, which he . . . gained while there employed." *Van Products Co. v. General Welding & Fabricating Co.,* 419 Pa. 248, 213 A.2d 769, 776 (1965). *See Sims v. Mack Truck Corp., supra,* at 600. However, an employee is not entitled to take with him and to disclose his knowledge of the trade secrets or secret processes of his employer:

The usual situation involving misappropriation of trade secrets in violation of a confidential relationship is one in which an employer discloses to his employee a pre-existing trade secret (one already developed or formulated) so that the employee may duly perform his work. In such a case, the trust and confidence upon which such legal relief is predicated stems from the instance of the employer's turning over to the employee the pre-existing trade secret. It is then that a pledge of secrecy is impliedly extracted from the employee, a pledge which he carries with him even beyond the ties of his employment relationship.

*Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430, 434 (1960). *See Cataphote Corp. v. Hudson*, 422 F.2d 1290, 1295 (5th Cir. 1970); *Bull v. Logetronics, Inc.*, 323 F.Supp. 115, 132–33 (E.D.Va.1971).

■ In *Macbeth-Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 86 A. 688 (1913), the plaintiff's former employee disclosed his knowledge of a secret formula for Alba glass to one of the plaintiff's competitors. Although the former employee was not bound by an express contract not to disclose the trade secrets of his employer, the Court held that he was subject to an implied duty not to disclose:

> The knowledge of the secret formula involved in this controversy came to [the employee] by reason of the position he occupied and the confidence reposed in him by his employers. The secret formula was communicated to him, not for his personal use, nor that he might profit by the knowledge thus obtained, but for the sole benefit of his employers, whose interests he was in duty bound to protect. It therefore would be inequitable and unjust that he should either disclose it to others, or make use of it himself, to the prejudice of his employers, who were entitled, as against him and those associated with him, to whatever advantage the manufacture of glass by the secret process gave their company.

Ames and Van Meter gained their knowledge of the construction of Anaconda's P&W machine in connection with their work on the machine for Anaconda. The information was not provided them for their personal use, but was disclosed in confidence so that they might perform their work. There is no suggestion in the record that either Ames or Van Meter had any part in the initial development of the machine, *cf. Wexler v. Greenberg, supra*. Under these circumstances, Ames and Van Meter were subject to an implied duty not to disclose Anaconda's trade secret. Even more clearly, Ames had an obligation not to remove Anaconda's drawings and tooling from its machines.

3. *Did Metric Have Notice That Ames' and Van Meter's Disclosure Was A Breach of Duty?*

We have no difficulty concluding that Hussian knew or should have known that Ames' and Van Meter's disclosures of the construction of the Anaconda P&W machine were a breach of their duty to Anaconda. Hussian had notice that the machine was a trade secret, and he knew that Ames' and Van Meter's knowledge of the machine was derived from their employment with Anaconda. Furthermore, he knew that Ames possessed Anaconda drawings and discarded tooling from the Anaconda machine. A reasonable man in Hussian's position would understand that Ames' and Van Meter's disclosures went beyond the bounds of generalized skill and experience, which an employee is free to utilize after he leaves an employer. And a reasonable man in Hussian's position would be aware that Ames' and Van Meter's disclosures of a secret manufacturing process of their former employer Anaconda was a breach of the confidential relationship between employer and employee. We note, however, that there is no evidence that Hussian knew that Ames had brought usable winding rolls back with him when he went to Mattoon with Sauers and incorporated them in the Metric machine.

4. *Did Metric Intentionally Procure Ames and Van Meter to Make Disclosures In Breach Of Their Duty?*

We can put no other interpretation on Hussian's conduct than that he purposely

induced Ames and Van Meter to disclose to him the construction of Anaconda's P&W machine. When his attempts to construct his own P&W machine without assistance from former Anaconda employees proved unfruitful, Hussian bypassed all efforts to hire tool and die makers in the Philadelphia area, or to locate help with experience in the manufacture of flexible metal hosing anywhere in the northeastern United States. *See* n.5, *supra.* Instead, he looked for help only in Mattoon, Illinois, and the surrounding area, focusing his search on employees and former employees at the Anaconda plant. If Hussian had wanted to hire employees with general skill in the construction and operation of P&W machines for the manufacture of flexible metal hosing, there would have been no need for him to restrict his search so narrowly, *i. e.* to a small area of Illinois. That restriction strongly supports the inference that Hussian was looking only for employees with special knowledge of the Anaconda machine and its TCA tooling, whom he could hire especially for the purpose of using that special knowledge.

 Because Hussian, acting in his capacity as president of Metric, having notice that Anaconda's P&W machine was a trade secret, induced Ames and Van Meter to breach their duty to Anaconda and knew or should have known that they were breaching a duty of confidentiality, Metric is liable for wrongful use of Anaconda's trade secret in the construction of its P&W machine for TCA manufacture.

### C. *Is Anaconda's Suit Barred by the Statute of Limitations?*

The parties agree, and we concur, that the applicable statute of limitations in this diversity action is the Pennsylvania six-year statute, 12 P.S. § 31. Metric argues that the action is barred by the statute of limitations since the acts of misappropriation occurred more than six years before the complaint was filed on August 3, 1976. Anaconda replies that the unauthorized use of a misappropriated trade secret is a continuing tort. In Anaconda's view, each unauthor-

ized use of the trade secret by the misappropriator is a separate tort giving rise to a new cause of action as to which the statute of limitations commences to run anew, and the effect of the statute of limitations is not to bar the action but only to limit plaintiff's recovery to damages sustained during the statutory period preceding the filing of the suit. There are no reported decisions on this issue in the Pennsylvania state courts or in federal courts following Pennsylvania law. Our task, therefore, is to predict how the Pennsylvania courts would decide the issue if it were presented to them. *Becker v. Interstate Properties*, 569 F.2d 1203 (3d Cir. 1977), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978).

Among decisions in other jurisdictions, there is a split in authority on the question whether or not adverse use of a misappropriated trade secret is a continuing tort. *See M & T Chemicals, Inc. v. International Business Machines Corp.*, 403 F.Supp. 1145 (S.D.N.Y.1975), *aff'd mem.*, 542 F.2d 1165 (2d Cir.), *cert. denied*, 429 U.S. 1030, 97 S.Ct. 656, 50 L.Ed.2d 637 (1976) (collecting cases). *See also Kistler Instruments A. G. v. PCB Piezotronics, Inc.*, 419 F.Supp. 120 (W.D.N.Y.1976). Our examination of the reported decisions reveals that the split in authority on this issue reflects a more fundamental split on the basis for legal protection of trade secrets.

There are two competing views on the theoretical basis for legal protection of trade secrets: the "property" view and the "confidential relationship" view. In *E. I. DuPont de Nemours Powder Co. v. Masland*, 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016 (1917), Justice Holmes stated that the basis of trade secret protection is the "confidential relations" between the parties, and not the status of the trade secret as intellectual property. The Holmes view has been rejected by the Pennsylvania Supreme Court. *Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 268, 213 A.2d 769, 780 (1965). Thus Pennsylvania adheres to the "property" view of trade secret law. *See Sims v. Mack*

*Truck Corp.*, 488 F.Supp. 592 (E.D.Pa. 1980) (Lord, C. J.), On that view, the theoretical basis for recovery on a trade secret claim is not merely the breach of a confidential relationship, but also the adverse use of the plaintiff's intellectual property.

As we have previously stated, Pennsylvania trade secret law follows Section 757 of the Restatement of Torts. That section creates a cause of action against a person "who discloses *or uses* another's trade secret." (emphasis added). The American Law Institute's comments explicitly state that "The rule stated in this Section protects the interest in a trade secret against both disclosure *and adverse use.*" Restatement of Torts § 757, Comment c at 8 (1939) (emphasis added). Thus the protection of trade secrets under section 757 and Pennsylvania law is not limited to protection against the initial disclosure, but embraces protection against subsequent unauthorized use as well.

These basic principles of Pennsylvania trade secret law—the treatment of trade secrets as intellectual property and the recognition of a separate cause of action for wrongful use of a misappropriated trade secret—control our decision on the statute of limitations issue. Since recovery may be premised not merely on the breach of the confidential relationship when the secret was disclosed, but also on subsequent wrongful use of the secret, the statute of limitations for the tort of wrongful use begins to run at the time of the wrongful use, and not at the time of the initial misappropriation. In other words, under Pennsylvania law, wrongful use of a misappropriated trade secret is a continuing tort.

Other courts which have adopted the continuing tort theory have noted its conceptual linkage to recovery for wrongful use of misappropriated trade secrets. The U.S. Court of Appeals for the District of Columbia observed that the Restatement of Torts § 757 supported the continuing tort theory,

for the reasons we have stated. *See Underwater Storage, Inc. v. United States Rubber Co.*, 125 U.S.App.D.C. 297, 301, 371 F.2d 950, 954 (D.C.Cir.1966), *cert. denied*, 386 U.S. 911, 87 S.Ct. 859, 17 L.Ed.2d 784 (1967). Another court which held that wrongful use of a trade secret is a continuing tort commented that "the gist of the claim is the *use* of the trade secrets, not necessarily their acquisition," *Telex Corp. v. International Business Machines Corp.*, 367 F.Supp. 258, 360 (N.D.Okl.1973), *aff'd in part, rev'd in part on other grounds*, 510 F.2d 894 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975) (emphasis added). The leading decision rejecting the continuing tort theory adopts the opposite view of trade secret law, following Justice Holmes' statements in *Masland, supra. Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 407 F.2d 288, 293 (9th Cir. 1969) (construing California law). *Cf.* 12A R. Milgrim, Trade Secrets § 7.04[2] (1979) (criticizing *Monolith*). *Monolith* is not consistent with the law of Pennsylvania.

Since Anaconda complains not merely of the misappropriation of its trade secret, but also of its wrongful use, we believe that Pennsylvania would hold that the statute of limitations commences to run anew with each wrongful use. Thus the effect of the statute of limitations is not to bar this action completely because the alleged misappropriation occurred more than six years before this lawsuit was initiated. Instead, its effect is to limit plaintiff's recovery to damages sustained by reason of the defendant's unauthorized use of the trade secret during the statutory six-year period preceding the filing of the suit.

### D. *Is Anaconda's Suit Barred by Laches?*

Metric argues that Anaconda is not entitled to relief because of laches.[12]

---

12. Metric contends that the suit is also barred because of Anaconda's unclean hands, pointing out that Anaconda sought to prevent Metric from relocating to Mattoon. *See* pp. 420–

421, *supra.* However, Hussian had already decided independently that he would not move his business to Mattoon. Thus, Anaconda's actions had no effect on Metric's business op-

The essential elements of laches are inexcusable delay in instituting suit and prejudice resulting to the defendant from such delay. *Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1258 (3d Cir. 1974). Laches is an equitable defense; its existence depends on the particular equitable circumstances of each case, and is a question primarily addressed to the discretion of the trial court. *Burke v. Gateway Clipper, Inc.*, 441 F.2d 946, 949 (3d Cir. 1971). In recognition of the equitable nature of the defense of laches, courts have also considered whether the party asserting the defense is a conscious wrongdoer. *E. g., TWM Manufacturing Co. v. Dura Corp.*, 592 F.2d 346 (6th Cir. 1979); *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609 (7th Cir. 1965); *John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292, 323 (E.D.Pa.1976) (Fullam, J.), *aff'd in part and rev'd in part on other grounds*, 587 F.2d 602 (3d Cir. 1978); *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F.Supp. 1341, 1368 (E.D. Pa.1972) (Becker, J.), *aff'd mem.*, 480 F.2d 917 (3d Cir. 1973). If laches is invoked by a defendant who is a conscious wrongdoer, he can prevail only if the plaintiff's delay "is so prolonged and inexcusable that it amounts to a virtual abandonment of the right by the plaintiff for a long period of time." *John Wright, supra, quoting Tisch Hotels, supra.*

### 1. Burden of Proof of Laches

■ The allocation of the burden of proof of laches depends on the length of the plaintiff's delay. If the delay is shorter than the applicable statute of limitations, then the defendant has the burden of proving laches.[13] If, on the other hand, the delay is longer than the applicable statute of limitations, then the defendant is entitled to a rebuttable presumption of both elements of laches. In that case, the plaintiff has the burden of disproving laches. *Gruca, supra*; *Miller v. United States*, 438 F.Supp. 514, 524 (E.D.Pa.1977) (Luongo, J.).

■ The relevant statute of limitations here is six years, as we have previously noted. In order to allocate the burden of proof of laches, we must determine whether the plaintiff has slept on its rights for more than six years. *See* n. 13, *supra*. We note that a plaintiff against whom laches is invoked is chargeable with knowledge not only of facts which were actually known to him at the time, but also of facts which he could have learned by means of an inquiry pursued with reasonable diligence.

> [T]he law is well settled that where the question of laches is in issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry.

*Johnston v. Standard Mining Co.*, 148 U.S. 360, 370, 13 S.Ct. 585, 589, 37 L.Ed. 480 (1893). *See GAF Corp. v. Amchem Products, Inc.*, 399 F.Supp. 647, 659 (E.D.Pa. 1975) (Luongo, J.), *rev'd on other grounds*, 570 F.2d 457 (3d Cir. 1978); *Window Glass Machine Co. v. Pittsburgh Plate Glass Co.*, 46 F.2d 484 (W.D.Pa.1921), *aff'd*, 284 F. 645 (3d Cir. 1922), *cert. denied*, 261 U.S. 623, 43

---

portunities. Moreover, Hussian admitted in his testimony that the reason for his initial interest in Mattoon was to make it easier to gain access to Anaconda employees with experience in TCA manufacture. We cannot say that the balance of equities related to this incident decisively favors Metric.

**13.** Although we have ruled that wrongful use of a misappropriated trade secret is a continuing tort for purposes of the statute of limitations, we do not view the continuing tort theory as relevant to the laches defense. The essence of the laches defense is the notion that the plaintiff has "slept on its rights." *E. g., Gruca, supra*, 495 F.2d at 1259. Thus for purposes of laches, plaintiff's delay should be measured from the time when it knew or should have known of defendant's wrongdoing. For purposes of the statute of limitations, the running of the statute is measured from the time when the plaintiff's cause of action accrues—normally at the time of the plaintiff's injury. Our holding that the statute commences to run anew from each wrongful use of the misappropriated trade secrets, pp. 425–426, *supra*, is therefore irrelevant to measurement of plaintiff's delay for purposes of the laches defense. Metric's continuing misconduct did not diminish Anaconda's knowledge of the initial misappropriation.

S.Ct. 518, 67 L.Ed. 832 (1923); *Turtzo v. Boyer*, 370 Pa. 526, 88 A.2d 884 (1952).

Six years before filing this suit, Anaconda knew that Hussian had paid an unauthorized visit to its Mattoon plant; that he had advertised in the Mattoon newspapers for tool and die makers to work in his plant in the Philadelphia area, about 1000 miles away; that he sought to hire present or former Anaconda employees at high salaries to design and build a P&W machine for the manufacture of flexible metal hose; that he had in fact hired Ames and Van Meter, who had built a P&W machine; that Metric had sold TCA to Western Electric; and that Metric's production was improving so that it would be a serious competitive threat. This knowledge was plainly sufficient to put a reasonably prudent person on inquiry to determine whether Metric had designed its P&W machine by misappropriating Anaconda's trade secrets. However, Anaconda made no such inquiry; nor did it take any action to assert its rights in its trade secrets. In fact, by April 15, 1969, more than seven years before it initiated legal action, Anaconda had actual knowledge of all the essential elements of Metric's misappropriation. Since its delay exceeded six years, Anaconda must rebut the presumption of laches by negating one or both of the essential elements of laches.[14] In addition, plaintiff may avoid or diminish the effect of laches by showing that defendant was a conscious wrongdoer.

### 2. *Inexcusability of Anaconda's Delay in Instituting Suit*

Anaconda argues that its delay in bringing suit was reasonable or excusable because it did not know of the misappropriation until 1976, when Sauers provided it with photographs showing that Metric's machine was nearly identical to Anaconda's. It contends that while Anaconda executives may have had some relevant information in 1968 and 1969, they had no "hard evidence" of misappropriation. Although Hogan, the Mattoon plant manager, testified that he suspected at the time that Metric was receiving technical information from former employees of Anaconda, the plaintiff argues that "suspicion is not knowledge," quoting *Kraft v. Cohen*, 32 F.Supp. 821, 825 (E.D. Pa.1940), *rev'd on other grounds*, 117 F.2d 579 (3d Cir. 1941).

While Anaconda did not have access in 1969 to all the evidence of misappropriation which it has presented here, it did have knowledge of all the essential elements of Hussian's campaign to gain access to its trade secrets. That knowledge was sufficient to make Hogan suspicious, and it was sufficient to put a reasonably diligent person on inquiry. As we have noted, a plaintiff against whom laches is invoked, who knows facts sufficient to put a reasonably prudent person on inquiry, is chargeable with knowledge of facts which he could have discovered by an inquiry pursued with reasonable diligence. While an estimation of what Anaconda could have learned by means of an inquiry into the misappropriation of its trade secrets is necessarily speculative, as it is based on a hypothetical inquiry which never took place, we are confident that an inquiry reasonably pursued would have disclosed further details of the misappropriation. For example, it would not have been unreasonable, given the extent of its knowledge in 1969, for Anaconda to have hired a private investigator to find out, by lawful means, whether Ames and Van Meter were revealing confidential in-

---

14. We agree with Judge Schwartz that a plaintiff who bears the burden of rebutting a presumption of laches may prevail by carrying the burden with respect to either of the elements of laches. *Lasseigne v. Nigerian Gulf Oil Co.*, 397 F.Supp. 465, 473 (D.Del.1975). As Judge Luongo has pointed out, there is dictum in some decisions which suggests that a plaintiff against whom laches is presumed bears the burden of disproving both elements of laches. *Baczor v. Atlantic Richfield Co.*, 424 F.Supp. 1370, 1380 n.5 (E.D.Pa.1976) (Luongo, J.) (citing cases). However, requiring the plaintiff to carry this double burden would be inconsistent with the conceptual structure of the laches doctrine, which requires the court to find both inexcusable delay on the part of the plaintiff and prejudice to the defendant. If a plaintiff rebuts the presumption as to either of the two elements, the court cannot find that both elements exist, and therefore cannot uphold the defense of laches.

formation. We do not think that a reasonable person would have waited until photographs which virtually proved misappropriation came into his possession fortuitously. We note also that the liberal discovery procedures of the federal courts would have been available to Anaconda in any legal action it initiated, as they have been in this action.

Anaconda also contends that its delay was reasonable or excusable because it was not actually damaged by Metric's adverse use of its trade secret until late in 1970 when Metric began to supplant it as Western Electric's supplier of TCA. We do not find that argument persuasive. And in any event, it provides an excuse for delay until the early 1970's, and not until August, 1976.

We conclude that Anaconda has failed to rebut the presumption that its delay in instituting suit was unreasonable and inexcusable. We add only that the result on this point would be the same even if there were no presumption.

### 3. *Prejudice to the Defendant*

Anaconda contends that Metric has not been prejudiced by the delay in bringing suit. It notes that no prejudice has resulted to defendant's ability to defend this action, as might have occurred if, for instance, a witness had died or records had been destroyed. While the defendant claims that he was prejudiced in that he built five P&W machines and invested much of his capital in TCA manufacture, Anaconda points out that Metric received considerable profits on this investment, and argues that Metric cannot have been prejudiced by carrying on a lucrative activity.

■ The prejudice which is an essential element of laches must be more than the mere continued use of a misappropriated trade secret. *Alfred Dunhill, supra,* 350 F.Supp. at 1368. However, the expansion of one's business and the expenditure of capital to undertake an activity which is later subjected to legal challenge is the kind of change of position which will support the defense of laches. *Continental Coatings Corp. v. Metco, Inc.,* 464 F.2d 1375, 1378

(7th Cir. 1972) (Stevens, J.); *Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co.,* 64 F.2d 185 (3d Cir. 1933); *Siemens Aktiengesellschaft v. Beltone Electronics Corp.,* 381 F.Supp. 57 (N.D.Ill.1974). By investing more and more of its resources in TCA manufacture, Metric exposed itself to greater damage liability and increased the cost to its business which is likely to result from injunctive relief. Anaconda's prompt action would have made it possible for Metric to devote its resources to other equally profitable business operations, instead of increasing its exposure to liability. Thus the mere fact that Metric's TCA operation was profitable does not preclude a finding of prejudice sufficient to support the defense of laches. While Metric has produced no evidence to show that it ever contemplated expanding its business in other areas, it is entitled to a rebuttable presumption of prejudice because Anaconda's delay exceeded the six-year period of the statute of limitations. Anaconda has failed to rebut that presumption.

### 4. *Conscious Wrongdoing*

■ In balancing the equities to determine whether plaintiff's suit is barred by laches, a court may consider whether the defendant "has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor." *TWM Manufacturing, supra,* 592 F.2d at 349. Such egregious conduct may be shown by demonstrating, for example, that the defendant to a claim of patent infringement participated in "deliberate, calculated plagiarism," *id.,* or that the defendant to a claim of trademark infringement "was fully aware of the plaintiff's mark and reputation," *Alfred Dunhill, supra,* 350 F.Supp. at 1368.

■ We have no difficulty in concluding that Metric was a conscious wrongdoer. The only inference that can be drawn from Hussian's conduct is that after his initial attempts to buy or build a P&W machine failed, he deliberately set out to construct a duplicate of Anaconda's machine. He knew

that Anaconda had the only machine in the United States then capable of manufacturing TCA, and he knew or should have known that the machine, and the manufacturing process, were confidential. As we have noted, Hussian treated Metric's P&W machine as confidential, thereby evincing his awareness that the machine was not a matter of public knowledge, and also perhaps demonstrating some fear of apprehension.

### 5. Anaconda's Apparent Acquiescence in Metric's Misconduct; The Effect of Anaconda's Conduct on Relief

Although we have labeled Metric a "conscious wrongdoer," we view the effect of this categorization as mitigated somewhat by Anaconda's apparent acquiescence in its misconduct. Anaconda's inaction was not "so prolonged and inexcusable that it amounts to a virtual abandonment of the right," *John Wright, supra, quoting Tisch Hotels, supra,* so as to give the laches defense its full effect. However, Hussian had every reason to believe that Anaconda was aware of his intentions, since he had been discovered in the Mattoon plant, and had offered jobs to or sought information from Anaconda employees. Anaconda's failure to protest or even to investigate his activities could justifiably have given Hussian the impression that he had the right to pursue the course of action he was following. Although Hussian's original scheme did amount to conscious wrongdoing, Anaconda's seeming acquiescence in his activities makes the continuation of his wrongful conduct less egregious. We turn now to the impact of this state of affairs on relief.

While Anaconda has failed to rebut the presumption of laches by disproving the existence of inexcusable delay or of prejudice, it has, as we have seen, succeeded in demonstrating that Metric was a conscious wrongdoer. There is some authority to the effect that laches will bar the award of damages against even a conscious wrongdoer, but will not bar injunctive relief. *E. g., Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 419, 36 S.Ct. 357, 362, 60 L.Ed. 713 (1916); *Philadelphia Extracting Co. v. Keystone Extracting Co.,* 176 F. 830 (E.D.Pa. 1910). On the other hand, most recent decisions discussing the conscious wrongdoer doctrine as a bar to laches assume that conscious wrongdoing, if proved, would totally negate the defense of laches permitting both damages and injunctive relief. *E. g., TWM Manufacturing, supra.*

We do not find it necessary to subscribe to one rule or the other. The essential nature of laches lies in the balancing of equities in light of the particular circumstances of each case. *E. g., Burke v. Gateway Clipper, supra.* Because the egregiousness of Metric's conduct is offset by the unreasonableness of Anaconda's inaction, particularly its inaction after Hussian was aware that Anaconda was aware of his activities, we do not believe that it would be fair either to permit laches to bar the action totally, or to permit the conscious wrongdoer doctrine completely to counteract the laches defense. Given the rather unique facts of this case, the result which we deem appropriate is to bar the plaintiff's damage claim because of laches, but to permit its claim for injunctive relief.[15] This result is in accordance with *Hanover Star, supra,* and is also based on our recognition that the showing of conscious wrongdoing here is not as strong as that contemplated in decisions like *TWM Manufacturing, supra.*

We are confident that it is within our power to limit the effect of the laches defense in this manner, since the invocation of laches is an appeal to the equitable side of the court. *Burke v. Gateway Clipper,* 441 F.2d at 949. "Whether laches bars an action in a given case depends upon the circumstances of that case and 'is a question primarily addressed to the discretion of the

---

15. We note also that plaintiff's damage claim was not established with great specificity. In particular, Anaconda was unable to separate out its profits on TCA from the profits earned on the balance of the Mattoon operation. While we might nonetheless be able to calculate damages despite these accounting deficiencies, our disposition of plaintiff's damage claim makes it unnecessary to reach the issue.

trial court.' " *Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 435, 85 S.Ct. 1050, 1058, 13 L.Ed.2d 941 (1965), *quoting Gardner v. Panama Railroad Co.*, 342 U.S. 29, 30, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951). The equities of this case, as we perceive them, require that we deny the laches defense its full effect of barring all relief, but give it partial effect. Consequently, we will grant equitable relief, but will not award damages because of the plaintiff's laches. The remaining question is how long injunctive relief should be effective.

## E. *The Duration of Injunctive Relief*

Metric argues that the duration of injunctive relief should be limited to the time necessary for independent development of a machine capable of TCA manufacture, without resort to misappropriated trade secrets. Although the Pennsylvania courts have never articulated a standard for the duration of injunctions entered in trade secret cases, *see Felmlee v. Lockett*, 466 Pa. 1, 351 A.2d 273 (1976) (affirming 4-year injunction without elucidation of relevant factors), many jurisdictions have adopted the "independent development" test. *E. g., K-2 Ski Company v. Head Ski Company*, 506 F.2d 471 (9th Cir. 1974); *Northern Petrochemical Co. v. Tomlinson*, 484 F.2d 1057 (7th Cir. 1973); *Sperry Rand Corp. v. Electronic Concepts, Inc.*, 325 F.Supp. 1209 (E.D. Va.1970), *vacated and remanded on other grounds*, 447 F.2d 1387 (4th Cir. 1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1292, 31 L.Ed.2d 479 (1972). See 12A R. Milgrim, Trade Secrets § 7.08[1] n.12 (1979).

The reasoning underlying the rule was aptly stated by the Illinois Supreme Court in *Schulenburg v. Signatrol, Inc.*, 33 Ill.2d 379, 212 N.E.2d 865 (1965), *cert. denied*, 383 U.S. 959, 86 S.Ct. 1225, 16 L.Ed.2d 302 (1966). In that case, the lower courts had permanently enjoined the defendants from selling a device known as a "flasher," which the defendants manufactured by use of the plaintiff's trade secrets. The Court reversed the entry of the permanent injunction, explaining:

Defendants have, in effect, been put out of business for all time, everywhere. This clearly is not necessary to make plaintiffs whole as it is conceded by them that their products may legally be copied by [their] competitors. Since defendants might have reproduced plaintiffs' flasher in this fashion, it is difficult to justify prohibition of such reproduction for a period of time longer than that required to duplicate the product by lawful means.

212 N.E.2d at 869. Although we have found that Metric did not construct its P&W machine by means of reverse engineering, we do not believe that the process of TCA manufacture, which is not the subject of a patent, is so esoteric that Metric would have been unable to manufacture the product by lawful means, if it had in fact relied on reverse engineering instead of misappropriation. Since the product, TCA, was freely available, Anaconda could not complain of its manufacture by a competitor who had designed a machine to make TCA by reverse engineering. Its trade secrets gave it a "head start" over competitors, not a permanent monopoly. Thus it is appropriate here to limit the duration of the injunctive relief to be afforded Anaconda to the time that would have been necessary for Metric to have developed its own process of TCA manufacture, given the advantages of "reverse engineering."

For reasons previously stated, we have found that time to be 16 months, and we will enter an injunction of 16 months duration. Since plaintiff is not entitled to damages because of laches, we will enter judgment for the defendant on plaintiff's damage claim. An appropriate order follows.