**ECOLAIRE INCORPORATED, and on behalf of The Allen-Sherman-Hoff Company, a division of Ecolaire Incorporated, Plaintiff,**

v.

**Stanley R. CRISSMAN and Epic, Inc., Defendants.**

**Civ. A. No. 81–2157.**

United States District Court, E. D. Pennsylvania.

Feb. 4, 1982.

Patrick T. Ryan, Virginia A. Gibson-Mason, Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiff.

Richard Z. Freeman, Jr., Robert R. Barolak, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

In this action, plaintiff seeks preliminary and permanent injunctive relief, as well as

compensatory damages by reason of defendants' alleged conversion of plaintiff's property, breach of contract, unfair competition, unjust enrichment and interference with contractual relations. Essentially, plaintiff alleges that defendant Epic, Incorporated was formed by defendant Stanley R. Crissman and William Smith, Jr., a former Ecolaire employee whose participation in the Epic enterprise constituted a violation of certain non-competition and confidentiality provisions of Smith's employment contract with plaintiff. Further, it is alleged that the defendant Epic gained entrance into the market for ash handling system replacement parts through the misappropriation of trade secrets and other unfair business practices. Most notably, plaintiff contends that Epic by-passed extensive amounts of reverse engineering to produce plaintiff's products through the use of plaintiff's confidential detail drawings and blueprints that were misappropriated by William Smith, who is now president of Epic, Incorporated. Following the filing of its complaint, plaintiff moved this Court for a preliminary injunction wherein plaintiff requests that this Court enjoin defendants from, *inter alia*, maintaining possession of plaintiff's confidential engineering drawings, utilizing plaintiff's confidential information and trade secrets, and unfairly competing with plaintiff.[1] Upon consideration of the evidence presented in a hearing on plaintiff's motion, this Court is persuaded that plaintiff has established the requisite elements to obtain preliminary injunctive relief, as more fully appears below:

1. See Plaintiff's Motion for Preliminary Injunction. Docket Entry No. 4.

2. Hearing Transcript at 51.

3. H.Tr. 52, 150–51. ASH is one of the major manufacturers of ash handling systems, and shares roughly equally with United Conveyor Company approximately 90 percent of the ash handling systems business in the United States. In the market for ASH system replacement parts, ASH's own share of the spare parts market stands at approximately 60 percent of the total market. ASH has approximately 450 employees and maintains a substantial sales force,

## FINDINGS OF FACT

### A. *Parties and Relevant Entities*

1. The plaintiff, Ecolaire, Incorporated, is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Malvern, Pennsylvania.

2. The Allen-Sherman-Hoff Company (ASH) is a division of Ecolaire, with its principal place of business at Malvern, Pennsylvania. Since the early 1920's, ASH has been in the business of constructing and installing systems to transport ash and other loose waste products generated by the combustion of fossil fuels at utility plants and other industrial installations.[2] Besides constructing and installing systems for ash handling, ASH sells replacement parts for its systems, with annual sales of such parts in the approximate amount of $18,000,000.[3]

3. The defendants are Epic, Incorporated and Stanley R. Crissman. Epic is a Wisconsin Corporation formed in November, 1979 and is in the business of selling replacement parts for ASH systems. Thus, Epic competes with ASH in the ASH system replacement parts business.[4]

The defendant Stanley R. Crissman is a resident of West Dundee, Illinois, and is vice president of Epic.[5]

4. Smith Machine Works (SMW) is an affiliate of Ecolaire and is operated by ASH. SMW manufactures approximately 400 parts for ASH systems, and these parts are, for the most part, manufactured for sale to ASH. SMW has conducted this business for approximately twenty years, first as an independent company, and later

including seven manufacturer's representatives, plus the Ecolaire sales force of 20 persons. In addition, ASH employs eleven regional customer servicemen who assist customers at no extra charge, plus a field service force is available for hire to service the systems. H.Tr. 56–57, 126–129. As a whole, the evidence suggests that ASH has meticulously developed a long standing reservoir of good will. H.Tr. 52.

4. See H.Tr. 2.84–85.

5. H.Tr. 2.83 et seq.

under the auspices of Ecolaire which acquired SMW in November of 1975.[6]

5. William J. Smith has served as president of Epic since its inception in November of 1979.[7] Smith also served as Vice President and General Manager of SMW from September 1, 1975 through August 31, 1980, pursuant to a written contract of employment.[8] Prior to 1975, Smith was an officer of SMW, this having been a family-owned business, founded in 1960 by the father of William J. Smith.[9]

### B.  Smith's Relationship to Ecolaire

6. On September 1, 1975, William J. Smith executed an employment agreement with Ecolaire and Country Gates, Limited which provided that Smith was to be Vice President and General Manager of SMW for a period of five years.[10]  In paragraph number 1 of this agreement, Smith agreed to

devote his full time, attention and energies to the business of Employer to the best of his ability and agrees to perform such services and duties as shall from time to time be designated by the Board of Directors of Employer, it being understood that cooperation and coordination with Ecolaire and its subsidiaries and affiliates is of the essence of this Agreement.[11]

Paragraph number 6 of the agreement contained several specific non-competition covenants which Ecolaire typically utilized with respect to the employment of officers of a corporation being acquired by Ecolaire. This paragraph provided: [12]

Employee agrees:

(a) That during the term of his employment hereunder and for a period of one year thereafter, he shall not furnish any individual, firm or corporation or other entity with the name of or any list or lists of customers of the Smith Division of Employer, or utilize such lists or information himself except as permitted by Employer's written direction;

(b) That he will not furnish, use or divulge to any individual, firm, corporation or other entity, except as permitted by Employer's written direction, whether for his own benefit or not, any information from the Smith Division of Employer relating to their methods of doing business, price structures, systems of operation, "knowhow," designs, forms or any other confidential information;

(c) That at any time within a period of one year following termination of his employment, he shall not contact directly or indirectly, any customer of the Smith Division of Employer;

(d) That subject to the provisions of Paragraph 7 during the term of his employment hereunder, or any time within a period of one year following the termination thereof, he shall not engage in a business competing with the Smith Division of Employer.  The geographical area covered by this covenant not to compete shall be in the Commonwealth of Pennsylvania;

(e) That for a period of one year from the date of the termination of his employment hereunder, he shall not hire any employee of the Smith Division of Employer, or directly or indirectly cause any such employee to leave the Employer;

(f) That for a period of one year from the termination of his employment hereunder, he shall not use the name "Smith" or any variation thereof in any capacity, individual, corporate, or in a partnership

---

6.  H.Tr. 57–58, 191, 2.74–76; Plaintiff's Exhibit 3.  Smith Machine Works, Inc. was purchased by Country Gate Machinery, Ltd., a wholly owned subsidiary of Ecolaire.  After Smith Machine Works was purchased, it was sometimes referred to as the "Smith Machine Works Division."  Throughout this opinion, this business entity shall be designated as SMW, for purposes of conciseness.

7.  H.Tr. 2.50.

8.  H.Tr. 2.46–50.  Plaintiff's Exhibit 3.

9.  H.Tr. 2.74.

10.  H.Tr. 2.46–47;  Plaintiff's Exhibit 3.

11.  Plaintiff's Exhibit 3.

12.  H.Tr. 61.

or otherwise in connection with a business similar to that of the Smith Division of Employer; and

(g) That for the purpose of Paragraph 6(d) above, Employee shall be regarded as engaged in a business "competing with the Smith Division of Employer" if directly or indirectly he is engaged as a partner, owner, agent, representative, employee, officer, director or stockholder (except as a minority stockholder in a corporation listed on a national securities exchange) or participates in the operation or management of any business selling any product or products or offering any service of the kind or character which the Smith Division of Employer is selling or offering at that time, and which it has sold or offered during the term of this Agreement.[13]

In paragraph number 10 of this agreement, Smith agreed that his employer "does not have a remedy at law adequate to protect its ... trade secrets" and that the employer has the right to enjoin him from violating the provisions of paragraph 6.[14]

7. On May 3, 1977, Smith entered into a second agreement with Ecolaire.[15] This agreement specifically designated Ecolaire as Smith's employer. By the terms of this agreement, Ecolaire agreed to pay Smith $100. for each invention which in the judgment of the company warranted an application for a United States patent. Further, paragraph 4 provided:

"Employee shall maintain secret, all confidential or proprietary information obtained by him relating to the business of the Company or any of its related companies, including but not limited to equipment, apparatus, devices, products and manufacturing, marketing, sales and operations (including customer lists), procedures, systems and processes, and that he will not make, use, sell or reveal any of the same to any competitor or any other person either during or after his term of employment by the Company unless and until the same shall have become a matter of public knowledge or until written permission shall have been given to him by the Company for such sale, transfer, or other disclosure. All drawings, specifications, manuals, brochures, customer's lists, and the like are the property of the Company. If the employee's employment is terminated for any reason, he will immediately return all such property to the Company." [16]

In addition, Smith agreed that breach of this provision would cause irreparable harm to Ecolaire, warranting equitable relief.[17]

C. *Epic Background*

8. Since its incorporation in November of 1979, there have been only two employees of Epic, William Smith, Jr. and Stanley R. Crissman. Smith has served as President of Epic, handling purchasing and engineering matters. Crissman has served as Vice President, and has handled administration, sales and financing.[18]

9. Crissman and Smith began discussing the formation of Epic at least as early as the summer of 1979. At that time, Smith was still Vice President of SMW and Crissman was an officer of Abrading Systems, which was a frequent subcontractor of SMW.[19]

10. Epic was in business as early as November, 1979, as evidenced by purchase orders as of that date.[20]

---

13. Plaintiff's Exhibit 3, ¶ 6.

14. Plaintiff's Exhibit 3.

15. H.Tr. 2.47; Plaintiff's Exhibit 4. The earlier agreement had designated Country Gates, Ltd. as Smith's employer.

16. Plaintiff's Exhibit 4.

17. Plaintiff's Exhibit 4, ¶ 8.

18. H.Tr. 2.50, 85. Smith and Crissman were the incorporators of Epic. Smith has operated out of his home in Pennsylvania. H.Tr. 2.51. Smith and Crissman are the sole shareholders of Epic. H.Tr. 2.84.

19. H.Tr. 2.48, 2.138–140.

20. Plaintiff's Exhibit 6c.; H.Tr. 124. Evidence from SMW phone records reveals that Smith spent an inordinate amount of time on the telephone with Crissman from the summer of 1978 through Smith's departure from SMW. Although the subject matter of such conversa-

11. At the time Smith participated in the formation of Epic, he knew Epic would be operating in competition with Ecolaire and ASH. Smith nonetheless proceeded to solicit accounts for Epic, although he recognized at that time that he had an obligation to seek business for Ecolaire.[21]

12. At the time Smith and Crissman formed Epic, Crissman was aware of Smith's 1975 employment contract with SMW, and Crissman was aware of the existence of restrictions on Smith's ability to compete with SMW.[22]

13. Smith and Crissman knowingly competed with Ecolaire, ASH and SMW during the same period that Smith was employed by Ecolaire and SMW. Further, there is no doubt that Epic used Smith's name in its communications in order to obtain opportunities for Epic that Smith's name would normally bring to SMW.[23]

14. From the inception of Epic, Smith conducted the operation of Epic business from his home in Pennsylvania. This included the communication with Epic customers from a location in Pennsylvania. Further, Smith even charged Epic for business trips to destinations in Pennsylvania.[24]

15. While Smith was still in the employ of SMW and Ecolaire, he was not devoting his full time and energy to the conduct of SMW business. For instance, while still employed by Ecolaire, Smith was travelling for and collecting expenses from Epic. In some instances, he even charged expenses to Ecolaire while travelling for Epic.[25]

### D. *ASH Proprietary Drawings*

16. In manufacturing and subcontracting for the manufacture of ASH's replacement parts, ASH utilizes detailed engineering drawings of those parts. These drawings contain valuable confidential information belonging to ASH and have been treated accordingly by longstanding company policy.[26] Since 1922, the vast majority of such drawings have contained a proprietary notice to the effect that the drawing is the property of ASH and therefore not to be reproduced, copied, lent or used to furnish information or manufacture parts except by specific agreement with ASH.[27]

17. In 1976, ASH made changes in its proprietary notice both to reflect certain changes in the logo, and in response to new legal advice. Further, in response to apparent pirating by other firms of ASH products, Ecolaire executives directed their division to insure that all ASH drawings contain the new proprietary legend, which provides as follows:

"This drawing and its design are the property of _____. This drawing is loaned to you subject to the condition that it shall not be reproduced, copied, lent or otherwise disposed of, directly or indirectly. It shall not be used to furnish any information for the making of drawings, prints, or apparatus, or parts there-

tions is unknown, the evidence suggests that discussions toward the formation of Epic may have begun earlier than the summer of 1979. Plaintiff's Exhibit 6A.

21. H.Tr. 2.52–54.

22. H.Tr. 2.124.

23. H.Tr. 2.49–54.

24. H.Tr. 110–116; 2.50–51; Plaintiff's Exhibit 6D.

25. See note 24 *supra*; Plaintiff's Exhibit 6D shows that on July 17, 1980, Smith charged both Epic and Ecolaire $272.00 for a trip to Chicago.

26. H.Tr. 228–232; 2.165–167.

27. H.Tr. 261. For instance, plaintiff's Exhibit 21 contains an ASH proprietary notice dating back to December 20, 1928, as follows:

"NOTICE—This drawing is the property of the Allen-Sherman-Hoff Co., Philadelphia, and is lent subject to the condition that it shall not be reproduced, copied, lent or otherwise disposed of directly or indirectly. It shall not be used to furnish any information for the making of drawings, prints, or apparatus, or parts thereof except where otherwise specifically provided for by contract agreement with the ASH Co. The equipment and designs shown on this drawing are covered either by issued patents or pending applications in U. S. and foreign countries and are the exclusive property of the Allen-Sherman-Hoff Co." (P–Ex–21).
See also H.Tr. 261.

of, except where otherwise specifically provided for by contract agreement with _____.[28]

18. While he was Vice President of ASH, Smith had access to all ASH drawings sent to SMW by ASH for the approximately 400 parts that SMW manufacturers for ASH.[29]

19. Not only did Smith have access to approximately 400 ASH drawings while he was Vice President of SMW, but on a number of occasions he actually entered the drawing files at ASH headquarters in Malvern, Pennsylvania and copied drawings. On one occasion, Smith was observed making such copies at ASH headquarters after he had terminated his employment with Ecolaire.[30]

20. Epic used proprietary ASH drawings to produce parts it offers for sale in competition with ASH (and SMW), even though it knew that the drawings were ASH property.[31]

21. Smith used ASH drawings on Epic's behalf despite his awareness that this was a serious breach of business ethics, as well as a violation of the rights of Allen-Sherman-Hoff.[32]

### E. *Drawings Sent to Special T*

22. Special T Design and Manufacturing Company of Reading, Pennsylvania, has done subcontracting work for SMW. In October or November of 1980, Smith visited the offices of Special T and informed Albert Knabb, the President of Special T, of the existence of Epic and of Smith's involvement with this company.[33]

23. On behalf of Epic, Smith sent numerous drawings to Special T, along with parts manufactured by a competitor of ASH, Helmick Corporation. These parts were sent so that Special T could verify the tolerances on those parts. Among those drawings sent to Special T were ASH proprietary drawings.[34]

24. Special T received from Smith a number of exact copies of ASH detailed drawings with the ASH name and proprietary notice cut out. Smith admits to having cut out the ASH notices.[35]

25. Special T produced parts for Epic using ASH proprietary drawings. In some instances, the drawings were used from which Smith had cut out the proprietary notices.[36]

26. In one instance, Smith directed Special T to destroy a mold that Special T had created from an ASH drawing. This was purportedly done to avoid causing what Smith believed to be "more damage" to ASH.[37]

### F. *ASH Drawings Sent to Vendors Other Than Special T*

27. An unknown number of additional ASH drawings were sent to other suppliers.

**28.** Plaintiff's Exhibit 8; H.Tr. 228–32. The blank spaces are to be filled with the name of the applicable division of Ecolaire. This tightening of security was directed to key ASH employees in November and December of 1976. Plaintiff's Exhibits 8, 9.

**29.** H.Tr. 2.54. Smith, in fact, made a special request to ASH that a drawing of any part be provided to SMW with every purchase order for such part. Plaintiff's Exhibit 27.

**30.** H.Tr. 220–222.

**31.** H.Tr. 23–30, 242–48, 2.55. As used throughout this opinion, the term "proprietary drawings" means that the drawings contain valuable, confidential information relating to the manufacture and design of ASH replacement parts. ASH "proprietary parts" are those parts that would require reverse engineering absent access to ASH proprietary drawings. The

Court deems those parts on Joint Exhibit 1 to be proprietary if they are designated either B-, B, or B+. See Joint Exhibit 1 at pp. 1–3. Thus, a substantial number of ASH proprietary parts were offered in Epic's parts list.

**32.** H.Tr. 2.80–81.

**33.** H.Tr. 15–18.

**34.** Not all of the drawings admittedly sent to Special T are accounted for. H.Tr. 21–31; 48, 49; Plaintiff's Exhibit 20; 2.59–61.

**35.** Plaintiff's Exhibits 12–18; H.Tr. 21–31; 2.55.

**36.** E.g., Plaintiff's Exhibits 12, 14, 15, 16, 17; H.Tr. 23–30.

**37.** H.Tr. 46–47.

Crissman testified that upon learning that Smith had sent ASH drawings to suppliers, he instructed Smith to recall all outstanding ones to ascertain which ones were ASH property. As of the date of the hearing, an unknown number of recalled drawings were still "en route." [38]

28. It is admitted outright that at least 15 to 20 ASH drawings were used by Epic in carrying out its replacement parts business. It is likely that Epic used a considerably larger number of proprietary ASH drawings. [39]

G. *Epic Drawings*

29. Epic's own drawings generally do not indicate the draftsman who made the drawing. Nor are revisions or their dates noted. Thus, it is impossible to tell from the drawings whether they were done by Smith, Crissman or someone hired by Epic. [40]

30. In numerous instances, ASH drawings were copied by an Epic draftsman and labelled to disguise the fact that they were ASH proprietary drawings. [41]

H. *Customer Information*

31. Over a number of years, ASH has developed customers for its replacement parts, and maintains its customer listings as confidential proprietary information. Customers of ASH for ash handling systems and replacement parts include industrial installations as well as electric utilities. There are approximately twice as many industrial accounts as there are electric utilities. [42]

32. There exist publicly available directories of all electric generating utilities in the United States. However, such directories do not list industrial installation that would be ASH customers. Nor would such directories indicate current sales of ASH systems. [43] Thus, access to a directory of electrical utilities is no substitute for the valuable inside knowledge of the identity of customers and of their particularized needs that could be gained by one exposed to internal management correspondence of ASH and SMW regarding awards of contracts for ASH systems or parts. [44]

33. Smith had access to valuable ASH customer information during the time he was employed at SMW. [45]

34. ASH makes recommendations concerning the appropriate renewal parts for its entire system to the customer in a certain format called Recommended Renewal Parts Lists (RRPL's). These are first provided when the system is sold, and are developed with ASH expertise covering all equipment and recommended stock. However, this document becomes the customer's property and ASH has exercised no significant degree of control, contractually or otherwise, to prevent distribution of this document to third parties. [46]

---

**38.** H.Tr. 134–135. As of the date of the hearing, the number of drawings still outstanding was unknown.

**39.** See Joint Exhibit 1; Defendant's Exhibit 61; H.Tr. 2.136; H.Tr. 2.70. Plaintiff's Exhibits 12–18, 28 & 2A through 38 and 38A; 39, 39A and 39B through 41, 41A and 41B.

**40.** H.Tr. 2.149–151. It is customary drafting procedure to note revisions on such drawings. *Id.*

**41.** Plaintiff's Exhibits 28 & 28A through 38 and 38A; 39, 39A & 39B through 41, 41A & 41B; H.Tr. 2.11–40. Neither do defendants contest that Plaintiff's Exhibits 42–50 represent parts for which Smith used ASH drawings. See Defendants' Memorandum in Opposition to Plaintiff's Motion for Admission of Exhibits Into Evidence, Docket Entry No. 40 at 2.

As respects the series of exhibits 28 & 28A through 38 & 38A, it is incredible that certain drafting errors would have been exactly duplicated had the drawings been independently drafted from reverse engineering. Other Epic drawings appear to be exact copies of ASH drawings to the extent of precise, incidental details, e.g., 39, 39A & 39B through 40, 40A & 40B.

**42.** H.Tr. 122; 249.

**43.** H.Tr. 129.

**44.** H.Tr. 118–123; 129, 208.

**45.** H.Tr. 123.

**46.** H.Tr. 59–60; 143–44, 153, 158–60.

### I. *Pricing Information*

35. ASH has no specific cumulative price lists, but rather maintains a confidential pricing format consisting of various formulas applied to cost.[47] There is some evidence that Epic actually used ASH pricing formulas in making quotes to customers. Epic's ability to make bids on projects was enhanced by its ability to calculate ASH's costs through application of ASH price formulas to ASH price quotes that Epic had obtained.[48]

### J. *Supplier Information*

36. ASH has numerous suppliers for its ash-handling systems, and its knowledge of these suppliers for particular parts is of great value. These suppliers sometimes produce ASH parts according to specifications which are referenced by numbers that appear on ASH parts.[49] Epic has utilized ASH specification or "SP" numbers on its parts list. Thus, the knowledge of the particular supplier of an ASH part, plus use of the ASH SP number could enable Epic to obtain replacement parts made to ASH specifications expeditiously. Epic could not have realistically made certain bids for projects without this supplier information.[50]

### K. *Trademarks*

37. The United States Patent Office has granted registration to approximately ten ASH trademarks. The latest of such registrations occurred in 1978, although the rest were registered in 1964 or earlier.[51] In a few instances, Epic has made quotations on parts designated by these registered trademarks, as though these trade names were its own.[52]

### L. *Reverse Engineering*

38. One means of duplicating ASH parts is through reverse engineering. This process involves a series of steps by which a part is obtained, measurements are taken, drawings prepared, analysis of metallurgical components is obtained, and, finally, after patterns or molds are made, the part is produced.[53]

39. Even upon careful completion of this process, however, there is no guarantee that the reverse engineered part will be fully interchangeable with an ASH part.[54] This is due to the difficulty in determining from the part alone its manufacturing tolerances (i.e., the minute margin of error within which the dimensions of the part must fall).[55]

40. Some ASH parts are relatively simple and could be reverse engineered in a short time. Others, such as the ASH "clinker grinder" could take months, partic-

---

**47.** H.Tr. 123–24.

**48.** Certain testimony of plaintiff's witness Carey, not objected to, suggests that there exist Epic documents showing that Smith knew of ASH confidential price formulae and that he used such information on behalf of Epic. *See* H.Tr. 123–124; 143–44.

**49.** H.Tr. 276, 284.

**50.** H.Tr. 276. The Court is inclined to accept plaintiff's explanation of how Epic located suppliers and gained such rapid entry into the market, rather than Crissman's own explanation. See H.Tr. 2.94, 2.154–58. That is, the mere use of a manufacturer's directory could hardly enable Epic to realistically bid on the Texas Municipal Power Agency Project prior to any commitments from numerous known suppliers.

**51.** H.Tr. 154. The following trademarks have been granted registration: A–S–H, Hydrobin, Hydrovac, Hydrovacuum, Econo-Ash Ashcolite, Hydrovactor, Hydrojector, Hydromix, and Ashfrac. Plaintiff's Exhibit 7. Many of these trademarks were used by ASH considerably earlier than the registration dates.

**52.** Plaintiff's Exhibit 5 at p. 21 (Hydrojector [sic] ); *Id.* at p. 28 (Hydrovactor).

**53.** H.Tr. 209–211.

**54.** For instance, Epic has purchased ASH parts from Helmick, a competitor of ASH that reverse engineers ASH parts without using ASH drawings. However, when Epic purchased Helmick parts for resale, Epic considered it necessary to have the manufacturing tolerances checked out by a third party, sometimes using ASH drawings. H.Tr. 2.60.

**55.** H.Tr. 2.194.

ularly if only Smith and Crissman were performing the reverse engineering.[56]

41. Through its use of ASH proprietary drawings, Epic avoided a considerable amount of reverse engineering and thereby saved substantial time and expense.

### M. *Passing Off*

42. In some instances, Epic stamped ASH numbers on its parts that would ostensibly suggest that the parts originated from SMW.[57]

43. Epic has forthrightly represented that "all" of its parts are genuine ASH parts and not substitutes.[58]

### N. *Damage*

44. Epic's use of ASH and SMW part numbers, plus its designation of certain products by ASH trademarks will create misapprehension concerning the quality of ASH parts if the Epic counterparts are mis-manufactured.[59]

45. A number of ASH drawings, admittedly appropriated by Epic, remain unaccounted for.[60]

46. By contract, Smith has acknowledged that any breach of his employer's rights would cause irreparable harm.[61]

47. ASH promptly took action to investigate potential damage and preserve its rights upon learning of the activities of Epic.[62]

### DISCUSSION

### A. *The Standard Governing the Issuance of Preliminary Injunctive Relief*

To support a preliminary injunction, the moving party must demonstrate that irreparable injury will occur if relief is not granted to maintain the status quo until a final adjudication on the merits can be made and that there is a reasonable probability of eventual success on the merits. In addition, the court must weigh the possibility of harm to the non-moving party as well as to any other interested persons and when relevant, harm to the public.

*Continental Group, Inc. v. Amoco Chemical Corporation*, 614 F.2d 351, 356–57 (3rd Cir. 1980).

### B. *Irreparable Injury*

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." Wright & Miller, *Federal Practice and Procedure*, § 2948 at 431 (1973 ed. & cum. supp.). In this regard more than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a "clear showing of immediate irreparable injury," *Ammond v. McGahn*, 532 F.2d 325, 329 (3d Cir. 1976), or a "presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law."

*Continental Group, Inc. v. Amoco Chemical Corp.*, 614 F.2d 351, 359 (3d Cir. 1980).

The facts already established have revealed that ASH's sales of its replacement parts constitute a substantial part of its business, and such sales form the basis of considerable, longstanding, and meticulously developed goodwill.[63] It is further evident that more than sixty years of research, development, testing, production, market-

---

**56.** H.Tr. 2.209–210.

**57.** On one occasion, Epic stamped the number SMW141527C on certain gates that it sold. H.Tr. 2.175–177.

**58.** See Plaintiff's Exhibit 6, Letter of February 3, 1981 to Salt River Project.

**59.** See H.Tr. 100–101.

**60.** H.Tr. 2.142; 2.66.

**61.** See Plaintiff's Exhibits 3 ¶ 10; 4 ¶ 8.

**62.** H.Tr. 65–66.

**63.** See note 3 *supra*.

ing and field experience have yielded invaluable, closely guarded trade secrets. There is no doubt but that ASH will suffer significant, irreparable injury to its business if defendants are permitted to continue their program of unfair competition and use of ASH proprietary information. Irresistably lured by the prospect of huge profits (without the need of ASH's investment), other key employees taken into the confidence of Ecolaire or ASH may decide to exploit their inside "know how" of the manufacturing and marketing of ASH products. The pirating of ASH products, as evidenced in this case, can only result in the depletion of ASH's reservoir of good will, long nurtured through tremendous investment in time, money, research, and customer service.

Although enhanced by years of financial investment, the value of ASH's good will and trade secrets cannot be measured in monetary terms. Accordingly, it has been held that injury to a company's good will constitutes irreparable injury. *Franklin Mint, Inc. v. Franklin Mint, Ltd.*, 331 F.Supp. 827 (E.D.Pa.1971). Further, the use by an employee of his former employer's confidential information or trade secrets has been found to be irreparable harm warranting injunctive relief. *United Insurance Company of America v. Dienno*, 248 F.Supp. 553 (E.D.Pa.1965).

The facts of record have established various instances of "passing off" of Epic's products as those originating directly from ASH or SMW.[64] The resulting inability of plaintiff to control the qualify of goods associated with its name will also constitute irreparable harm. See *Franklin Mint, Inc., supra,* at 830.

Lastly, the tortious interference with contractual relations may cause irreparable injury. *See Adler, Barish, Daniels, Levin, Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175 (1978), *cert. denied*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979). Unquestionably, Epic's interference with plaintiff's contractual rights in Smith's employment agreements had and may continue to cause irreparable damage, particularly if others follow Smith's example.

**64.** See notes 57 and 58, *supra,* and accompany-

In summary, as a result of the conduct of Epic and its principals, ASH stands to lose significant benefits of its years of development, experience and training if defendants remain free to exploit ASH's proprietary information as well as practice other unfair methods of business.

### C. *Likelihood of Success on the Merits*

#### 1. *Misappropriation of Trade Secrets*

To determine the plaintiff's likelihood of eventual success on the merits of its trade secret claims, "the threshold question we must decide is whether plaintiff possesses legally protectible trade secrets." *Anaconda Company v. Metric Tool & Die Company*, 485 F.Supp. 410, 421 (E.D.Pa.1980). "The concept of a trade secret is at best a nebulous one and has been variously defined by case and text authority." *Van Products Company v. General Welding and Fabricating Company*, 419 Pa. 248, 258, 213 A.2d 769, 775 (1965). Pennsylvania Courts have applied the definition set forth in Comment b to the Restatement of Torts § 797:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers . . . Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article . . . .

Quoted in *Anaconda Company v. Metric Tool and Die Company, supra,* at 421. See also *Van Products Company v. General Welding and Fabricating Company, supra,* 419 Pa. at 258–59, 213 A.2d at 775. Comment b to § 797 goes on to describe the requisite element of secrecy that must be found to establish trade secret status:

> . . . The subject matter of a trade secret must be secret. Matters of public

ing text.

knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which are markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. . . . Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information.

Quoted in *Anaconda, supra,* at 422.

Turning to the evidence in this case, plaintiff has produced evidence seeking to establish the trade secret status of numerous items in the form of engineering drawings, customer lists, supplier lists, and pricing information.

First, plaintiff has established that its detail engineering drawings, from which its replacement parts may be manufactured, contain valuable proprietary information based on years of development and manufacturing experience. These drawings give ASH a distinctive advantage over its competitors in the profitable replacement parts business. Absent access to such drawings, competitors must resort to a costly, time consuming process of reverse engineering in order to produce many of the parts described in the drawings. Further, plaintiff has established that it has, by long standing company policy, taken "reasonable precautions under the circumstances to prevent unauthorized disclosure" of the drawings. See, *Greenberg v. Croyden Plastics Co., Inc.,* 378 F.Supp. 806, 812 (E.D.Pa.1974). These precautions have included strict company policy for many years limiting the dissemination of the drawings, as well as the use of notices describing the confidential and proprietary nature of the subject matter of the drawings. Although not all such drawings have been subject to these precautions to the same extent, the Court is persuaded that the vast majority of them have been kept from the public domain. Accordingly,

the great majority of ASH detail drawings will qualify as trade secrets.

ASH customer lists and related information contain confidential data of considerably greater value than the information contained in publicly available directories of electric utilities. It is a fair inference that inside familiarity with such information would provide invaluable insights regarding the replacement parts market: Such insights would no doubt concern the particular needs, credit-worthiness and shipping information relative to specific customers. Similarly, plaintiffs have established facts relative to the value and confidentiality of supplier lists and pricing policy. Armed with such inside knowledge, a competitor's ability to bid on projects is significantly enhanced. Thus, it is the Court's view that plaintiffs have substantiated their claims as to the value of each category of proprietary information, their rights to utilize such information, and the fact that "except by the use of improper means, there would be difficulty in acquiring the information. *Anaconda Company v. Metric Tool and Die Company, supra,* at 423.

Liability for the unauthorized use of trade secrets is defined in Restatement of Torts § 757, which has been adopted as law in Pennsylvania. See *Anaconda Company v. Metric Tool and Die Company, supra,* at 422–23. The Restatement provides:

One who . . . uses another's trade secret, without a privilege to do so, is liable to the other if

(a) he discovered the secret by improper means, or . . .

(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other.

In this case, the record presents a distressing picture of how the defendants misappropriated and used ASH trade secrets by such actions as, *inter alia,* the wrongful conversion of ASH proprietary drawings and the use of such drawings in making parts for Epic, the use of ASH drawings to

make Epic drawings that were disguised to appear as Epic's own drawings, Epic's inducement of a former Ecolaire employee to disclose ASH trade secrets, the violation of confidentiality agreements made with Ecolaire by an Epic principal, and the use of ASH customer and pricing information in competition with ASH.

More particularly, Epic wrongfully used ASH trade secrets that were discovered by improper means in that Smith as President of Epic discovered and used the trade secrets by improper means. The Court has found that Smith took for his own use and the use of Epic a number of ASH confidential drawings. This occurred both before and after he left the employ of Ecolaire and SMW. Further, Smith had access to various other forms of confidential proprietary information, which were in turn utilized by Smith on Epic's behalf.[65] Smith's appropriation of this information for Epic's use violated both express and implied duties of confidentiality which he owed to Ecolaire and SMW. That is, in both of Smith's employment agreements, he agreed that he would not in any way disclose or use confidential information gained through his employment.[66] Second, Smith's position as Vice President of SMW gave him access to numerous pre-existing trade secrets. As such, the Court is persuaded that "the nature of [his] relationship with [Ecolaire and SMW] gave him an implied duty of non-disclosure." *Anaconda Company, supra,* at 423. Thus, plaintiff has demonstrated a substantial likelihood of success on their

claim premised upon Restatement of Torts § 757(a). As respects § 757(c), it need hardly be said that Epic (through its President, Smith) learned of and used trade secrets with notice that such information was trade secret material belonging to Ecolaire, ASH, and SMW. Crissman as well must have been on notice of these facts by virtue of his relationship to Smith and Epic. Further, Crissman did not adequately investigate the allegations of the complaint filed against him and Epic. See, *Anaconda Company, supra* at 423; H.Tr. 2.134, 137. In this respect as well, therefore, plaintiffs have demonstrated probable success upon ultimate resolution of the merits of this case.

### 2. Unfair Competition

Unfair competition is almost universally regarded as a question of whether the defendant is passing off his goods or services as those of the plaintiff by virtue of substantial similarity between the two, leading to confusion on the part of potential customers."

.    .    .    .    .

By definition, unfair competition involves conduct which is contrary to honest, industrial and commercial practice. *International Society of KRISHNA Consciousness of Western Pennsylvania, Inc. v. Stadium Authority of the City of Pittsburgh,* 479 F.Supp. 792, 797–98 (W.D.Pa. 1979). Moreover

---

**65.** It is impossible to determine from the present record the precise extent that Epic utilized the various categories of ASH's confidential proprietary information. However, Smith's admitted use of ASH drawings with knowledge that this violated the rights of ASH, plus his access to other forms of valuable confidential information, plus Epic's rapid entry into the replacement parts market together strongly suggest to the Court that plaintiff's rights were violated in all of the categories of proprietary information discussed in this opinion.

**66.** Defendants contend that Smith's employment agreements are inapposite to this litigation in several respects. First, they contend that plaintiff has no standing to enforce the 1975 employment agreement, since it desig-

nates, "Country Gate Machinery, Ltd." as Smith's employer. However, Ecolaire, Inc. is a party to this employment agreement, and the agreement designates Country Gate as "an affiliated company" of Ecolaire. The agreement further provides that "cooperation and coordination with Ecolaire and its subsidiaries and affiliates is of the essence of this agreement." Plaintiff's Exhibit 3 at p. 2.

As respects the 1977 agreement, defendants contend that Smith received no consideration for this agreement. However, this agreement designated Ecolaire as his employer and further promised to pay a certain bonus to Smith for each patentable invention Smith should produce.

The trading on another's business reputation by use of deceptive selling practices or other means is enjoinable on the grounds of unfair competition. If the particular use in question is reasonably likely to produce confusion in the public mind, equity will restrain the unfair practice and compel an accounting of the profits gained thereby. *Thomson-Porcelite Co. v. Harad*, 1947, 356 Pa. 121, 51 A.2d 605; *Stroehmann Bros. Co. v. Manbeck Baking Co.*, 1938, 331 Pa. 96, 200 A. 97; 87 C.J.S. Trade Marks, etc. §§ 91–93, pp. 325–333 (1954). *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 635, 136 A.2d 838, 848 (1957).

The facts of record reveal that Epic and Crissman have unfairly competed with ASH by passing off Epic's goods as ASH goods. As related in the Court's findings of facts, Epic designated parts in price quotations by ASH registered trademarks, it stamped ostensive ASH and SMW numbers on certain of its parts, it forthrightly represented that "all" of its parts were ASH parts and not substitutes, it used Smith's name in communications on Epic's behalf to solicit customers in violation of Smith's employment contract and to obtain opportunities for Epic that Smith's name would bring to Ecolaire or SMW. In the Court's view, this manner of conducting business by Epic must tend "to create the impression that [its] goods are derived from another actually unrelated source [ASH] and may properly share such good will as plaintiff has earned for that source under its mark." *Telechron, Inc. v. Telicon Corp.*, 198 F.2d 903, 909 (3rd Cir. 1952). Accordingly, plaintiff has demonstrated likelihood of success on this claim as well.

3. *Inducement to Breach Contracts of Confidentiality and Non-Competition*

A court of equity will protect an employer from the unlicensed disclosure or use of his trade secrets by an ex-employee provided the employee entered into an enforceable covenant so restricting his use, *Fralich v. Despar*, 1894, 165 Pa. 24, 30 A. 521, or was bound to secrecy by virtue of a confidential relationship existing between the employer and employee, *Pittsburgh Cut Wire Co. v. Sufrin*, 1944, 350 Pa. 31, 38 A.2d 33.

*Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430, 433–34 (1960). Similarly, "employment contracts containing general covenants not to compete after the termination of the employment are prima facie enforceable if they are reasonably limited as to duration of time and geographical extent." *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 628, 136 A.2d 838, 844 (1957). The Court has found that William Smith, President of Epic, had entered into two agreements with Ecolaire. Both of these agreements restricted Smith from divulging confidential business information of SMW and Ecolaire. The 1975 agreement further contained a covenant not to compete, reasonably limited in time and geographical scope, whereby Smith was prevented from competing with SMW for one year after the termination of his employment within the Commonwealth of Pennsylvania. "One who intentionally interferes with an existing contractual relation is subject to liability for the breach of the contract." *Morgan's Home Equipment Corp., supra*, 390 Pa. at 633, 136 A.2d at 847. At the hearing, Crissman admitted his awareness of the contractual restrictions on Smith's ability to compete with SMW and to disclose ASH trade secrets, and the awareness existed at the time of Epic's formation. Thus, Crissman had "knowledge of the plaintiff's interests, or at least of facts that would lead a reasonable man to believe in their existence." See W. Prosser, *Handbook of the Law of Torts*, § 129 at 941 (4th ed. 1971).

More obviously, however, the President of Epic, William Smith, knew of these agreements, yet "Epic" through Smith proceeded to intentionally interfere with plaintiff's contractual rights. Thus, it is the Court's view that plaintiff has established its entitlement to preliminary relief on this ground as well.

**D.** *Relief Requested and Balance of Hardships*

Accompanying its Motion for Preliminary Injunction, plaintiff submitted a proposed order that would grant the relief requested in its motion. The proposed order provides in part:

1. Defendants Stanley R. Crissman ("Crissman") and Epic, Inc. ("Epic"), and all persons or entities in active concert or participation with them, ARE HEREBY RESTRAINED AND ENJOINED PENDING RESOLUTION OF THIS CASE ON THE MERITS FROM:

(a) maintaining possession of Allen-Sherman-Hoff's ("ASH's") proprietary and confidential documents, or any copies thereof;

(b) soliciting or inducing or attempting to solicit or induce any other agents, employees or representatives of ASH to breach their employment agreements;

(c) unfairly competing with ASH;

(d) utilizing or employing ASH's confidential information, designs, drawings and trade secrets; and

(e) offering for sale or selling any ASH proprietary parts;

See Docket Entry No. 4.

In its Proposed Findings of Fact and Conclusions of Law (and amendments thereto), docket entry nos. 32 and 33, plaintiff adds additional requests. First, there is requested a "twofold injunction" that would prohibit sales of ASH proprietary parts for five years and prohibit sales by Epic of any ASH non-proprietary part for three years. See Docket Entry No. 32 at 126. In addition, plaintiff now seeks upon grant of its Preliminary Injunction Motion, an accounting to ASH for any profits derived from the unlawful activities of defendants. See docket entry no. 32 at 125.

As earlier related, the Court is persuaded that plaintiff would suffer irreparable injury if defendants remain free to engage in the sort of conduct proscribed in plaintiff's proposed order. It is also the Court's view that defendants would not suffer any un-due hardship from the entry of such an order. To prohibit defendants from utilizing plaintiff's confidential information, and engage in other forms of unfair competition will no doubt restrict the ability of Epic to conduct its replacement parts business, and such an order may thereby decrease Epic's revenues. However, it is not unduly harsh to deprive defendants of the profits of their amply evidenced wrongdoing.

As respects plaintiff's request for a three year injunction prohibiting sales by Epic of non-proprietary ASH parts, the Court is persuaded that this would unduly harm defendants. In fact, such an Order would undoubtedly put defendants out of business entirely. Accordingly, a prohibition of all sales by Epic of even non-proprietary parts is beyond the degree of relief to which plaintiff is entitled.

Plaintiff has, however, demonstrated a significant degree of unlawful conduct on defendants' part, as well as a clear and existing threat of imminent irreparable injury. With some important qualifications, therefore, the Court will adopt the form of relief set forth in plaintiff's original proposed order. See Docket Entry No. 4.

The order will enjoin unfair competition with ASH, which will be defined to include: the designation in any form or manner by Epic of any of its parts by a trademark (or term resembling such a trademark) for which a certificate of registration has been granted to Ecolaire, Incorporated, or the Allen-Sherman-Hoff Company by the United States Patent Office, or any representation by defendants to the effect that Epic's parts are genuine ASH parts or identical thereto.[67]

The order will also enjoin the selling or offering for sale of any ASH proprietary parts unless the parts have been, or are reverse engineered by the defendants or anyone on their behalf without the use of ASH detail drawings obtained by William Smith. The order will define "ASH detail drawings obtained by William Smith" to include those drawings obtained by Smith

---

**67.** See notes 51–52, 57–58, *supra*, and accom-   panying text.

in the course of his employment with Country Gate, Ltd.,[68] as well as any such drawings obtained by Smith from the custody of ASH or the Smith Division of Ecolaire, Incorporated after the termination of Smith's employment with Country Gate.[69] This provision will also restrict the ability of Epic to use ASH proprietary detail drawings that might be obtained from third parties if the drawings contain a "proprietary legend" such as has been affixed to the majority of ASH detail drawings for many years.[70]

The reasons for this aspect of the order are as follows: First, the record establishes that an unknown number of drawings had been converted to Epic's use and these drawings were utilized to manufacture parts and to check the dimensions of parts obtained from other sources. In addition, many ASH drawings were copied by Epic draftsmen.[70] Further, in its short time of operation, Epic has offered for sale a considerable number of parts that would require reverse engineering.[71] Crissman admitted at the hearing that he had performed only a small amount of reverse engineering, and there is no indication how much reverse engineering Smith had performed.[72] Smith, however, had access to many proprietary ASH drawings. Thus, the Court is persuaded that a significantly larger number of parts in Epic's catalogue may have been tainted by use of ASH proprietary information than has been admitted by defendants. The restriction on the future sale of ASH proprietary parts is intended to insure that no further use of ASH proprietary information is involved in Epic's manufacture or sale of any parts that must be reverse engineered from the ASH parts, and further irreparable harm to the legitimate interests of ASH in its trade secrets will be forestalled. Further, no undue hardship is imposed on defendants by requiring them to properly reverse engineer parts that are intended to be interchangeable with genuine ASH proprietary parts, and defendants will remain free to sell nonproprietary parts available on the open market, provided no other trade secrets are utilized.

As respects the final provision in the order, which enjoins the sale of particular parts, the parts listed are derived from three sources.

First, twenty parts are sourced from a Stipulation and Order Concerning Interim Relief that defendant had proposed, and is attached as Exhibit A to Defendant's Proposed Findings of Fact and Conclusions of Law in Opposition to Plaintiff's Motion for Preliminary Injunction. See Docket Entry No. 34. In the Court's view, defendants have agreed to the appropriateness of an injunction relating to these parts.[73]

Second, the list includes those parts which defendants have admitted are "tainted" by the use by Epic of drawings obtained from ASH by William Smith, as designated by Crissman's notations on Joint Exhibit 1.

Third, the list includes those parties on the Epic parts list which, according to testimony offered by plaintiff, were derived from ASH proprietary drawings copied by Epic. The Court credits testimony offered by plaintiff and deems it appropriate to

---

**68.** As of the date of the hearing, not all of the drawings taken by Smith had been accounted for, and the Court has found that a larger number were taken than has been admitted by defendants. See the Court's Findings of Fact 26 and 27. See also Plaintiff's Exhibit 27.

**69.** As related in the Court's Findings, Smith copied ASH drawings on at least one occasion after he left the employ of Ecolaire. See Finding No. 18. The order is thus intended to preclude Epic's use of drawings wrongfully taken by Smith whenever this may have occurred.

**70.** See the Court's Finding of Fact No. 29.

**71.** See Joint Exhibit 1.

**72.** H.Tr. 2.156. Yet Epic felt capable of making a substantial bid for the Texas Municipal Power Agency project for the supply of 600 parts. H.Tr. 2.154–157.

**73.** Most of these parts are, in any event, either admittedly "tainted" or, there exists independent evidence that they are based on copied drawings. See Joint Exhibit 1.

enjoin the sale of these parts pending final resolution of this case.[74]

### E. *Public Interest*

Plaintiff has demonstrated that it is a company of longstanding good will with the capacity to apply considerable expertise in the field of ash handling systems for coal fired generating systems. As a result of many years of research, development and experience, plaintiff has developed valuable trade secrets. The Court is persuaded that the public interest would be furthered by protecting such trade secrets from misappropriations by those who have not devoted the time and investment to their development. Defendants, of course, urge the Court to consider the countervailing public interest in free competition in this highly concentrated market. The policy of favoring competition, however, does not mean that defendants are entitled to free access to plaintiff's trade secrets, nor does this mean that defendants may compete unfairly. In this latter regard, to the extent that defendants have misrepresented that their products are identical to genuine ASH products, the customers of Epic will be mislead in that such parts will not be subject to the same testing, quality control, and revision that ASH parts enjoy.

### F. *Security*

Federal Rule of Civil Procedure 65(c) provides:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

In this case, there is little if any evidence from which the Court could determine a monetary figure that would represent the costs or damages that might be incurred by defendants as a result of this injunction. In the exercise of its discretion, therefore, the Court will adopt a substantial figure of $100,000. This amount should be sufficient to protect defendants without placing an unreasonable burden on a company such as plaintiff's.

### G. *Accounting*

In the complaint in this action, plaintiff prays "for an accounting of all monies and profits on sales defendants have made through the use of ASH's confidential and proprietary information." This request is addressed in the context of Plaintiff's Motion for Preliminary Injunction. See Plaintiff's Prehearing Memorandum Concerning its Request for Preliminary Injunction. Docket Entry No. 18 at 12.

The Court deems that this is an appropriate case for an award of profits in that "the evidence ... shows a conscious wrongdoer plus at least a hope for reasonably accurate calculation and allocation of profit." See D. Dobbs, *Handbook on the Law of Remedies*, § 6.6 at 499 (1973). *See also Boyd v. Cooper*, 269 Pa.Super.Ct. 594, 410 A.2d 860, 861 (1979). Nonetheless, the matter shall not be addressed in the present Preliminary Injunction Order, and should more properly be incorporated into a final order.

### ORDER

■ AND NOW, this 4th day of February, 1982, it appearing that irreparable injury, loss and damage will result to plaintiff in that its business may be seriously and irreparably damaged absent the entry of this Order, and it further appearing that plaintiff has no adequate remedy at law and is entitled to equitable relief against defendants until this Court has an opportunity to hear the case on the merits,

IT IS HEREBY ORDERED AND DECREED THAT:

---

**74.** Again, the Court notes that it is impossible to precisely delineate which parts in the Epic parts list were manufactured or purchased using ASH proprietary drawings. The Court is persuaded that a considerable number of such parts must have been tainted beyond those admittedly tainted parts. Thus, for the purposes of this preliminary injunction, the Court chooses to enjoin this egregious conduct by reference to those parts for which there is specific evidence of taintedness. A final order in this case might well add to the list.

1. Defendants Stanley R. Crissman ("Crissman") and Epic, Inc. ("Epic"), and all persons or entities in active concert or participation with them, ARE HEREBY RESTRAINED AND ENJOINED PENDING RESOLUTION OF THIS CASE ON THE MERITS FROM:

(a) maintaining possession of Allen-Sherman-Hoff's ("ASH's") proprietary and confidential documents, or any copies thereof;

(b) soliciting or inducing or attempting to solicit or induce any other agents, employees or representatives of ASH to breach their employment agreements;

(c) unfairly competing with ASH; For the purpose of this ORDER, "unfairly competing with ASH" shall include, the following acts: the designation in any form by defendants of any Epic product by a trademark (or term resembling a trademark) for which a certificate of registration has been granted to Ecolaire, Incorporated or ASH by the United States Patent Office; or any representation by Epic to the effect that its parts are genuine ASH parts or identical thereto.

(d) utilizing or employing ASH's confidential information, designs, drawings and trade secrets; and

(e) selling or offering for sale any ASH proprietary parts unless the parts have been or will be reverse engineered by the defendants or anyone on their behalf, provided no detail drawings of Allen-Sherman-Hoff obtained by Mr. William Smith are or were used in any manner whatsoever in the reverse engineering process. "Detail drawings of Allen-Sherman-Hoff obtained by William Smith" shall include any detail drawings or copies thereof obtained by William Smith in the course of his employment by Country Gate, Ltd., as well as any detail drawings or copies thereof obtained by William Smith from the custody of ASH or the Smith Division of Ecolaire, Incorporated after the termination of Smith's employment with Country Gate, Ltd., as well as any detail drawings owned by ASH or copies thereof obtained from third parties if such drawings have affixed a proprietary legend to the effect that the drawing is the property of ASH and that the information contained therein is not to be used except by agreement with ASH.

2. Notwithstanding paragraph 1(e) above, defendants Stanley R. Crissman and Epic, Inc. and all persons in active concert with them ARE HEREBY RESTRAINED AND ENJOINED PENDING RESOLUTION OF THIS CASE ON THE MERITS from the manufacture, order, sale, offer to sell, or delivery of any of the following parts:

| | Description | Epic Part Nos. | Ash Part Nos. |
|---|---|---|---|
| 1. | Graphitar Bushing Ass'y | 130005 | A–15657 |
| 2. | Thrust Bearing | 130006 | 15656 |
| 3. | Valve Seat | 130010 | 14589 |
| 4. | Gate Shaft | 130015 | 14429–13 |
| 5. | Ring Packing | 130016 | 15672 |
| 6. | Valve Disc (Ball Type) | 130041 | 15094 |
| 7. | Cap | 130049 | 2632 |
| 8. | Rod Packing Back-Up | 130059 | 15654–1 |
| 9. | Crank Arm Washer | 130060 | 15655 |
| 10. | Crank Arm | 130067 | 14469–3 |
| 11. | Crank Arm | 130061 | 14469–7 |
| 12. | Gate Shaft | 130070 | 14429–11 |
| 13. | Spacer | 130084 | 14479–3 |
| 14. | Shaft, Driv'n Ass'y | 130194 | A–8860 |
| 15. | Driving Shaft Ass'y | 130195 | A8859–1 |
| 16. | Eccentric Axle | 130248 | 14176–2 |
| 17. | Gate Seat | 130891 | 13037 |
| 18. | Gate | 130895 | 13041–1 |
| 19. | Sealing Tube | 131025 | 7935A |
| 20. | Shaft Sleeve for Clinker Grinder | 131040 | 8842–B |
| 21. | Inlet Piece | 131086 | 14019–4 |
| 22. | Gate Shaft | 131136 | 14429–10 |
| 23. | Inlet Piece | 131157 | 14019–1A |
| 24. | Intermediate Wear Piece | 131159 | 14016–5 |
| 25. | Spur Gear | 131258 | 12601–1 |
| 26. | Slide Gate | 131361 | 12815–4F |
| 27. | Slide Gate | 131362 | 12815–4G |
| 28. | Clinker Grinder Shaft Assembly | 131365 | A16161–15LH |
| 29. | Clinker Grinder Shaft Assembly | 131366 | A16161–16RH |
| 30. | Clinker Grinder Shaft Assembly | 131367 | A16162–15LH |
| 31. | Clinker Grinder Shaft Assembly | 131368 | A16162–16RH |
| 32. | Support Bearing | 131471 | 14891–1 |
| 33. | Bearing Housing | 131472 | 14896–1 |
| 34. | Bearing Cover | 131473 | 14897–1 |
| 35. | Adaptor | 131491 | 14477 |
| 36. | Spacer | 131492 | 14479 |
| 37. | Bushing Sleeve | 131493 | 15659 |
| 38. | Bushing Sleeve Ass'y | 131494 | 15658 |
| 39. | Insert | 131495 | 15661 |

3. This Order shall be effective upon plaintiff's giving of security in the amount of $100,000, for the payment of such damages as may be suffered by any party in the event that this Order was wrongfully entered.